[Crim. No. 2413.   In Bank.—September 19, 1922.]

## THE PEOPLE, Respondent, v. LEE YICK, Appellant.

[1] CRIMINAL LAW—MURDER—COMMISSION PURSUANT TO DEFENDANT'S ORDERS — EVIDENCE—STATEMENTS TO POLICE DEPARTMENT.—In a prosecution for murder wherein the people claimed the defendant, as an officer of a Chinese tong, ordered the killing and that the homicide was committed in pursuance of and because of such orders, evidence that defendant two weeks before the murder applied to the police department for leave to arm some of the members of his tong with revolvers and thus prevent a tong war and guaranteed that his tong would do no shooting was admissible as tending to show his position of authority and his anticipation of the possibility of a tong war, and to enable the jury to determine whether his order was one which was likely to be obeyed.

[2] ID.—DECLARATIONS OF ACTUAL MURDER—PART OF RES GESTAE.— In such prosecution, evidence to the effect that before the defendant arrived at the side of a dying member of his tong and had questioned him as to who had stabbed him, the member of defendant's tong who actually committed the murder in question had also questioned the dying man and that the latter had stated that he had been stabbed by a member of another tong, whereupon the questioner evidenced great excitement and cried out for vengeance upon such other tong, was admissible as part of the *res gestae,* tending to show the probable effect of the order which the defendant gave at that time to kill any member of the other tong that the then present members of his tong could find.

[3] ID.—WHEREABOUTS OF DEFENDANT AT TIME OF MURDER—IMPEACHMENT OF TESTIMONY—DECLARATION TO OFFICERS.—Where in such prosecution, it was the theory of the state that the assassins procured their weapons at the headquarters of their tong and the defendant denied being there, it was proper to impeach his testimony by proof of a statement shortly after the killing made by him to the officers that he remained at the headquarters until he heard the shots fired.

[4] ID.—AIDING AND ABETTING CRIME—INSTRUCTION.—Where in such prosecution the jury had been instructed that murder in the first degree was the killing of a human being with malice aforethought and that the indictment charged the defendant with killing with such malice, a further instruction that if the deceased was killed by persons other than defendant, and defendant aided and abetted the killing by giving advice or counsel or command, which was acted upon by such persons, he was equally guilty of the offense charged with those who did commit the crime, was not erroneous, as permitting a verdict of guilty without proof of malice aforethought.

[5] ID.—ARGUMENT TO JURY—REFERENCE TO TONG WARS.—In such prosecution, it was not misconduct for the district attorney in his presentation of the case to the jury to make reference to tong wars, since it is a matter of common knowledge that the Chinese resort to systematic murders of members of opposing tongs in order to carry out their purposes.

[6] ID. — REFERENCE TO ABSENT WITNESS — MISCONDUCT WITHOUT PREJUDICE.—It was misconduct in such prosecution for the district attorney in his argument to make the unsworn declaration that one of the state's witnesses had gone to China, but was without prejudice where the matter concerning which the witness would have testified was testified to by other witnesses of both the state and the defendant.

[7] ID.—KNOWLEDGE OF KILLING—STATEMENT IN ARGUMENT—LACK OF PREJUDICE.—Where the district attorney utilized the testimony of a witness as to knowledge of the order given by the defendant to kill members of the rival tong to fortify his argument and did so in a fashion which might be deemed a corroboration of the witness, but upon objection of counsel, the district attorney read the portion of the record to the jury upon which he relied as the basis for his statement and expressly disclaimed any knowledge of the killing, and the court instructed the jury that they were not to take the statements of counsel made during the argument as evidence, no prejudicial error was committed.

[8] ID.—NEW TRIAL—MISCONDUCT OF JUROR—CONFLICTING AFFIDAVITS —QUESTION FOR TRIAL COURT.—On a motion for a new trial, the determination of a conflict in affidavits as to whether a juror was asleep when the instructions were being made, is for the trial court.

4. "Malice aforethought" in the definition of murder; what the term now means, and how the courts should deal with it in charging the jury, note, 38 L. R. A. (N. S.) 1054.

APPEAL from a judgment of the Superior Court of Fresno County. S. L. Strother, Judge. Affirmed.

The facts are stated in the opinion of the court.

Harris & Hayhurst, M. K. Harris and Herbert McDowell for Appellant.

U. S. Webb, Attorney-General, John H. Riordan, Deputy Attorney-General, B. W. Gearhart, O. L. Everts and Philip Conley for Respondent.

WILBUR, J.—The defendant, Lee Yick, was convicted of murder in the first degree and the death sentence was imposed. It is not claimed by the prosecution that the defendant personally killed the murdered man, Fook Kee, but it is claimed that the defendant, as second president of a Chinese tong, the Suey On tong, ordered the killing, and that the murder was committed in pursuance of and because of such orders. The evidence relied upon by the prosecution to sustain the conviction is substantially as follows: Shortly before 9 o'clock on the evening of June 7, 1921, a Chinaman named Lee Nam, a member of the Suey On tong, staggered into China Alley with a knife in his hand, having shortly before been stabbed. A police officer who was present sent for the defendant Lee Yick to come and interpret the dying statement to be made by the stabbed man. The defendant came immediately and asked Lee Nam who had stabbed him. Lee Nam replied that Wong Bing, belonging to the Bing Kong tong, had stabbed him. Thereupon Lee Yick, in the presence of a crowd of bystanders, gave orders in the Chinese language to the then present members of his tong, the Suey On tong, to get their guns and kill any members of the Bing Kong tong that they could find. Among the members of the Suey On tong present were Wong Toy and Tuck Jick. These men, with three or four others, immediately left, followed by the defendant, Lee Yick. They all repaired to the headquarters of the Suey On tong, across the street at 1013 China Alley, where again Lee Yick gave the following order: "Quick, go quick, Wong Toy and Tuck Jick is gone and see yourself that you men rush toward Fook Kee's place." Wong Toy and Tuck Jick

and Lee Jim, armed with revolvers, apparently obtained at the Suey On tong headquarters, proceeded immediately across the street to the butcher-shop of Fook Kee, a member of the Bing Kong tong, and there shot and killed him, and shot and wounded another Chinaman there present. Two weeks before the murder of Fook Kee the defendant had applied to the police department of Fresno for leave to arm some of the members of the Suey On tong with revolvers in order that they might aid the vigilance of a watchman who had been employed by the Suey On tong, and thus prevent a tong war. The defendant then guaranteed that the Suey On tong would do no shooting.

The evidence of the people was amply sufficient to sustain the verdict of murder in the first degree, and, indeed, inconsistent with any other verdict, and although flatly contradicted by the evidence of the defendant and his witnesses in so far as the orders claimed to have been given by the defendant for the killing of the Bing Kongs is concerned, is not subject to review by us. We will, therefore, devote our attention to the errors alleged to have been committed in the admission and rejection of testimony and in the instructions to the jury and the alleged misconduct of the district attorney and of a juror.

[1] The appellant complains of the admission in evidence of the above-mentioned statements made by the defendant to members of the police department two weeks before the murder, when the defendant requested that a permit be granted to members of the Suey On tong to carry revolvers. This evidence was admissible for several reasons. It tended to show that the defendant occupied a position of authority in the Suey On tong, such that he could guarantee the conduct of his tong members, and it showed that the defendant anticipated the possibility of a war between his tong and some other tong in Chinatown. The evidence was relevant for the purpose of enabling the jury to determine whether or not the demand or order of the defendant that members of the Bing Kong tong should be killed was one which was likely to be obeyed as one given by a leader to his followers.

[2] Evidence was admitted to the effect that before the defendant arrived at the side of the dying Lee Nam and had questioned him as to who had stabbed him, Wong Toy

had also questioned Lee Nam and that Lee Nam had told Wong Toy he had been stabbed by a member of the Bing Kong tong; that Wong Toy thereupon evidenced great excitement and cried out for vengeance upon the Bing Kongs. It is claimed that it was an error to permit this testimony of declarations and acts of Wong Toy not in the presence of the defendant. Inasmuch as Fook Kee was killed by Wong Toy, we cannot see how the defendant would be prejudiced by evidence tending to show the animosity of Wong Toy. Such evidence would tend to show that he may have acted upon his own initiative instead of upon the orders of the defendant and consequently was favorable to the defendant. However that may be, the circumstance was clearly part of the *res gestae*. The exclamations and conduct of Wong Toy merely showed his excitement and his animosity against the Bing Kongs. There was nothing in the statement to inculpate the defendant nor to show his connection with the killing. It was not a declaration of co-conspirators, admissible as such, but was one of the incidents in connection with the double murder admissible as a part of the *res gestae,* tending as it did to show the probable effect of an order to kill given to an already excited and overwrought Chinaman.

[3] The defendant complains of a ruling of the court permitting the examination of two police officers in rebuttal of the defendant's testimony on the ground that it was sought thereby to impeach the defendant upon an immaterial matter. The defendant had testified that immediately after leaving the side of the dying Lee Nam he went to the headquarters of the Suey On tong and stood in the doorway a moment and then proceeded across the street to other houses along the street looking for Ah Chin, the president of the Suey On tong; that he did not again return to the headquarters of the Suey On tong, but remained with a friend overnight. The officers called in rebuttal testified that defendant had told them shortly after the killing that he had gone immediately from the side of the dying Lee Nam to the headquarters of the Suey On tong, and remained there until he heard the shots fired which killed Fook Lee. In view of the fact that the prosecution was based upon the theory that the assassins procured their weapons at the Suey On tong, it was clearly

important to determine whether or not the defendant procured and delivered these weapons to the assassins. If he only went to the doorway of the Suey On tong and immediately left after asking for the president, it would tend to show that he did not aid the assassins in getting their weapons. On the other hand, if he remained at the Suey On tong he had the opportunity to give them weapons, to give further orders, and to get in connection with others who might be implicated or interested in the commission of the crime. While the circumstance was perhaps of no great importance in view of the fact that the people's case rests upon the evidence of the giving of the orders for the killing at the side of the dying Lee Nam and evidence of the subsequent order given at the door of the Suey On tong to kill Fook Kee, the whereabouts of the defendant at the time of the killing and immediately prior thereto was material, and it was proper impeaching testimony to prove that defendant had stated that he was at the Suey On tong headquarters when the murder occurred.

[4] The defendant claims that an instruction given at the request of the people was erroneous. This instruction is as follows:

"You are instructed that if you find from the evidence introduced herein, beyond a reasonable doubt and to a moral certainty that the decedent Fook Kee was killed and murdered as charged in the indictment by persons other than this defendant, that the defendant herein, Lee Yick, did willfully, unlawfully and feloniously aid and abet the killing of Fook Kee, as charged in the indictment herein, by willfully, unlawfully and feloniously, prior to the commission of the acts which caused the death of said decedent, Fook Kee, giving advice or counsel or command to the party or parties whom you find from the evidence, beyond a reasonable doubt, did, in fact, cause the death of said Fook Kee and which advice or counsel or command was so acted upon by such party or parties, then you are instructed that this defendant is equally guilty of the offense charged in the information with the party or parties who did commit the crime, even though the evidence shows that said defendant was not personally present at the time the crime was actually perpetrated."

It is claimed that this instruction is erroneous in that it permits a verdict of guilty without proof of malice aforethought. This instruction contains a correct statement of the law. The jury had been instructed that murder in the first degree was the killing of a human being with malice aforethought; that the indictment charged the defendant with killing Fook Kee with malice aforethought. The jury by the instruction complained of were informed that if they found that Fook Kee was killed and murdered as charged in the indictment, that is to say, with malice aforethought, then they were to find the defendant guilty if he willfully, unlawfully and feloniously aided and abetted the killing of Fook Kee by willfully, unlawfully and feloniously giving advice or command to the parties who killed Fook Kee, which advice, counsel or command was acted upon by such murderers, that the defendant was equally as guilty as those who committed the crime, although not personally present at the time the crime was actually perpetrated. That is to say, if the defendant ordered Wong Toy and others to kill the deceased Fook Kee and they killed Fook Kee with malice aforethought, acting upon said order or command, the defendant was guilty of murder in the first degree the same as those who at his command actually killed the deceased. This instruction is strictly in accord with sections 31 and 971 of our Penal Code, which abolished all distinction between a principal and an accessory before the fact, and principals in the first or second degree, and provides that anyone who aids and bets or advises and encourages the commission of a crime is guilty as principal. Under the instructions, in order to bring in a verdict of murder in the first degree it was essential that the jury should find that the murderer who actually did the killing was animated by malice aforethought. That being true, the defendant who commanded him to do the killing would be equally guilty. It is impossible to arrive at any other conclusion than that the defendant himself was animated by malice aforethought if, as the jury found, he actually ordered someone over whom he had authority to go and kill Fook Kee. The premeditation which the law requires is necessarily involved in the giving of the order.

[5] It is contended that the district attorney was guilty of prejudicial misconduct in his argument to the jury.

The theory upon which he presented the case to the jury was that this killing occurred in a tong war between the Suey On tong and the Bing Kong tong; that Wong Toy was a subordinate member of the tong commanded by the defendant and that the killing was the result of defendant's orders given by virtue of his authority as second president of the Suey On tong. As it is a matter of common knowledge that the Chinese in this state resort to systematic murders of members of opposing tongs in order to carry out their purposes, we cannot see how the reference of the district attorney to tong wars can be declared harmful. (*People* v. *Ho Kim You,* 24 Cal. App. 451 [141 Pac. 950].) There is no other part of the general line of argument of the district attorney which was objected to or excepted to which requires any further consideration.

[6]   There are, however, two other points raised in connection with the district attorney's argument that require consideration. The district attorney having failed to produce a witness, Lee Bing Tom, whose name was indorsed on the indictment, defendant's counsel during his argument turned to the district attorney and asked: "Why isn't he here?" The district attorney replied, "I will tell you why, he has gone to China." The district attorney should not have answered counsel, except as a witness under oath, even when provoked by the defendant's counsel so to do. The statement of the district attorney was in the nature of unsworn testimony. However, there was the evidence of six witnesses on the part of the people and nearly as many on the part of the defendant as to what occurred by the side of the dying Lee Nam. Under these circumstances the failure of the prosecution to call another witness then present was of no serious consequence, and, therefore, the whereabouts of the witness was immaterial. We are unable to see any prejudice resulting to the defendant from the declaration of the district attorney.

[7]   A more serious question is that arising from a statement of a fact by the district attorney during his argument. He said: " . . . but I knew that night, the night of the shooting, he gave those orders. George Haw, the Chinese witness that spoke to you in English, told me in Chinatown, as soon as I arrived on the scene of the crime— he says, 'Lee Yick is responsible for this. I heard him

give the orders.'"  George Haw had testified on the subject of his statement to the district attorney.

On cross-examination of the witness, conducted by Judge
Harris, after a detailed examination as to the statements
made by Lee Yick at the side of Lee Nam, the following
had occurred:

"Q. 'Go get your guns and shoot the Bing Kongs,' that
is what he said, was it?  A. Yes, sir.

"Q. Is that all he said?  A. So he was gone, then, followed right behind the boys and left.

"Q. And was that all he said?  A. That is all I heard.

"Q. Who did you first tell about that, who did you tell
what your evidence would be here, anybody?"

The witness did not directly answer this question and
for that reason was questioned by the district attorney
on redirect examination as follows:

"Q. The judge [Judge Harris, defendant's attorney]
asked you who you told about Lee Yick first that night.  Who
did you tell first that night?  A. That night I think—I
was sent around Fook Kee's that night and then I told
you.

"Q. That same night.  And you told what officer first
when you went to Fook Kee's?  A. I told Mr. Ben Wickstrom."

The statement of the district attorney as to what George
Haw said was a perfectly proper statement of the evidence,
although it was so stated that an inference might have
resulted that the district attorney was adding the weight
of his testimony to that of the witness by his statement
"George Haw told me."  This is perhaps accentuated by
the fact that the district attorney in his argument said
"I knew" and put into the mouth of George Haw a statement in somewhat different terms than that justified by
his evidence, "Lee Yick is responsible for this, I heard
him give the orders"; while the evidence was that George
Haw told the district attorney that the order was given
by Lee Yick to kill Bing·Kongs.  Thereupon the argument was interrupted by the following colloquy:

"Mr. Harris: He said that to you?

"Mr. Gearhart: Yes, sir.  And on your cross-examination in this case, you asked him in reference to it.

"Mr. Harris: You say this was as soon as you, yourself, went over to Chinatown?

"Mr. Gearhart: Yes, sir.

"Mr. Harris: We assign that as error. It is not in the evidence. Now, the District Attorney goes further, the District Attorney says he knows, as I understand his argument, that as soon as he went over there, *he knew this had been done.*

"Mr. Gearhart: Give me the transcript. I am going to read to the jury, if you are quoting me on something. I will read the whole—no, there is too much of it. (Reads:)

" 'Q. The Judge asked you'—page 45, line 24—'The Judge'—[referring to Judge Harris] 'asked you who you told about Lee Yick first that night. Who did you tell first that night? A. That night, I think—I was sent around Fook Kee's that night, and then I told you'—indicating me [District Attorney Gearhart].

"Mr. Harris: Now that is not what I object to. I object to the District Attorney stating to the jury *that he knew what was done as soon as he went over there.*

"Mr. Everts (assisting the District Attorney): The testimony shows, that the counsel has just read, that that is exactly what the witness said—the Judge [Harris] asked him: 'Who did you tell about this matter?' And he answered: 'I told you, Mr. District Attorney' is this witness' answer, and· I submit the District Attorney had a right to comment upon that, under those circumstances.

"Mr. Harris: *That is not what I object to.* I object to the District Attorney's statement: *'I knew as soon as I went over there, this man had done that.'* I say that is not in the record, and it is improper, and we assign it as error. I don't want to interrupt the District Attorney at all, even if he gets out of the record, but a thing like that, I think it is improper.

"Mr. Gearhart: Would it satisfy you if I say I knew it because George Haw told me?

"Mr. Everts: That is exactly what he said, in following it up.

"Mr. Harris: The District Attorney said: 'I know what I said he did.'

"The Court: I don't think it is proper for the District Attorney to state it of his own knowledge.

"Mr. Gearhart: There has not been any inference that I was there and saw the crime committed. I don't understand the Chinese language. I would have to speak Chinese to know all this, and I was not over there at the time." (Italics ours.)

It was proper for the district attorney to comment on the testimony of George Haw, but it was not proper for him to either state that George Haw had told him on the night in question of the orders given by Lee Yick nor was it proper for the district attorney to state that he knew as a matter of fact that the orders had been given. The district attorney disavowed any personal knowledge concerning the killing or what was said by Lee Yick. At the time the court stated to the jury that it was improper for the district attorney to speak of it of his own knowledge, and subsequently instructed the jury elaborately that they were not to take the statements of counsel made during the argument as evidence. The matter then stands thus: The question of whether or not the witness George Haw had told the district attorney of the statement made by Lee Yick was an immaterial matter and one which could only be brought out, as it was, by the defendant's cross-examination of the witness, followed by an explanation on redirect. The district attorney utilized the testimony to fortify his argument and did so in a fashion which might be deemed a corroboration of this witness on this immaterial matter, but upon the objection of counsel the district attorney read the portion of the record to the jury upon which he relied as the basis for his statement and expressly disclaimed any knowledge of the killing. Under these circumstances, followed as the argument was by the instruction to the jury, we think that no prejudicial error was committed.

It seems, moreover, that defendant's real objection to the argument was not to the method of stating the fact of George Haw's statement to the district attorney, but to the declaration, "this man has done that," a statement never made by the district attorney.

[8] But one other point is raised in the case, and that is the alleged misconduct of one of the jurors. Upon the motion for a new trial affidavits were filed by the defendant's attorneys to the effect that during the reading of

the instructions they had observed that juror Perkins was asleep. They do not claim that the attention of the judge or of opposing counsel or of the juror was called to this situation until after the jury had retired and the judge was leaving the bench, when his attention was called to it. It is a sufficient answer to this point to say that other affidavits were filed tending to show that this juror was not asleep and that the determination of that conflict in testimony was for the trial court. In the light of that determination we must assume that the juror was not asleep.

Judgment affirmed.

Waste, J., Shaw, C. J., and Lawlor, J., concurred.

Rehearing denied.

All the Justices present concurred.

Richards, J., *pro tem.*, was acting.