[Crim. No. 5418. Fourth Dist., Div. One. Mar. 18, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
PETER BOHMER et al., Defendants and Appellants.

186

## COUNSEL

Edward La Plount, under appointment by the Court of Appeal, Harold F. Tyvoll and H. Peter Young for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, A. Wells Petersen and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WHELAN, J.**\*—Peter Bohmer and Peter Mahone have appealed separately from orders granting each of them probation after they were convicted by verdict in a joint trial of a violation of Penal Code section 587, subdivision 2. The appeals are discussed separately because of the differing grounds advanced for reversal, and because of the difference in the relationship of the facts to each of them. We deal first with Mahone's appeal.

Penal Code section 587 declares in part:

"Every person who maliciously . . .

"1.. . . . . . . . . . . . . . . . . . .

"2. Places any obstruction upon the rails or track of any railroad, or of any switch, branch, branchway, or turnout connected with any railroad;

"Is punishable by imprisonment in the state prison not exceeding five years, or in the county jail not exceeding one year."

The evidence shows Mahone was one of several persons who, on May 12, 1972, placed railroad ties across the tracks of the Santa Fe Railroad near Del Mar in San Diego County. The ties were then set on fire for the purpose of halting a train at the place of the obstruction.

Mahone's first appellate contention is based on his request that the following instruction be given to the jury:

"In the crime charged in count one of the indictment, there must exist a union or joint operation of act or conduct and a certain specific intent.

"In the crime of maliciously obstructing a railroad track, there must exist in the mind of the perpetrator the specific intent to obstruct the railroad tracks, and unless such intent so exists that crime is not committed."

The trial judge's refusal to give that instruction, and his giving of an instruction as to the general intent required to make the doing of a forbidden act criminal, are assigned as error.

---

\*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

Mahone's brief states: "This frustrated any opportunity of the defense to present to the jury the crucial question whether the actions of Mahone and others were intended only as symbolic protest, without any actual intent of obstructing the railroad tracks."

Here Mahone has confused the motive behind the doing of the act with the intent with which it was done. The reasonableness of protest against war in general, or the war in Vietnam in particular, is irrelevant. The price to be paid by those whose protest for the sake of a cause professed by them to be noble involves the criminal destruction of or interference with the property of others, is to accept the penalties fixed by the law.

The court also instructed as to the meaning of "malice" in the language of Penal Code section 7, subdivision 4.

An obstruction is a thing that obstructs or impedes; an obstacle. (Webster's New Internat. Dict. (2d ed.))

The intent required for a violation of Penal Code section 587 is the intent to place an obstruction upon the rails or track of the railroad.

An intent to cause derailment of a train or to cause injury to any passenger or member of a train crew is not implied in the word "maliciously" as used in section 587.

In that respect there is some ground for comparison with the non-specific intent required for a violation of Penal Code section 245, subdivision (a) (assault with a deadly weapon), where the intent required is: ". . . the general intent to wilfully commit an act the direct, natural and probable consequences of which if successfully completed would be the injury to another." (*People* v. *Rocha,* 3 Cal.3d 893, 899 [92 Cal.Rptr. 172, 479 P.2d 372].)

The intent required for a violation of Penal Code section 587 is the intent to place upon the railroad tracks an obstacle when the direct, natural and probable consequence of such placing is the obstructing or impeding the progress of a train or other equipment for which the tracks were intended.

The use of the word "maliciously" in certain penal statutes does not make the crimes defined therein specific intent crimes. The definition

of malice in section 188, found in that part of the Penal Code dealing with homicide, must be distinguished. (See *People* v. *Conley,* 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Gorshen,* 51 Cal.2d 716 [336 P.2d 492].) Such other sections include section 203 (mayhem: *People* v. *Garcia,* 5 Cal.App.3d 15, 18 [85 Cal.Rptr. 36]); section 447a (arson: *People* v. *Nance,* 25 Cal.App.3d 925, 930 [102 Cal.Rptr. 266]); section 246 (discharging a weapon at an inhabited dwelling: *People* v. *Hoover,* 12 Cal.3d 875, 882 fn. 5 [117 Cal.Rptr. 672, 528 P.2d 760]).

*People* v. *McCree,* 128 Cal.App.2d 196, 202 [275 P.2d 95], in which a conviction was sustained, cannot be followed in its statement that "maliciously" does not mean "intentionally" as applied to the arson statute, or the doing of any act made punishable when done maliciously. (Pen. Code, § 7, subd. 4; *People* v. *Andrews,* 234 Cal.App.2d 69 [44 Cal.Rptr. 94].)

The malice required is that which would negate an accidental and unintended obstruction, such as might result if a vehicle being driven across the tracks should stall or overturn, and, before it could be moved off, should cause a train to slow down or stop.

There was no misdirection of the jury in that respect.

 Mahone's final two appellate contentions relate to the testimony of certain prosecution witnesses. The trial court submitted to the jury the question whether those prosecution witnesses were accomplices, and instructed that if they were found to be such their testimony would require corroboration. The correctness of the instructions as general principles of law is not questioned. Mahone contends, however, the trial court should have instructed that two witnesses, James Marmack and Charles Kett, were, as a matter of law, accomplices, and should not have instructed that the jury should determine whether the witnesses were feigned accomplices or accomplices in fact.

Mahone also argues that there cannot be a feigned accomplice to the commission of a crime that does not require a specific intent, and cites *People* v. *Brocklehurst,* 14 Cal.App.3d 473 [92 Cal.Rptr. 340], as authority for that untenable proposition. *Brocklehurst* held that when the sole witness to the commission of a violation of Penal Code section 288a was one of the participants in the act, he violated the statute which declares that any person who participates in the act is punishable. The opinion emphasized that the violation did not depend upon motive or intent if it

were voluntary, and that since the crime required two persons for its commission, anyone whose participation in the act was indispensable must be an accomplice. Mahone's discussion of the *Brocklehurst* case omitted mention of its strict definition of a crime requiring the participation of two persons and the indispensability of each of them to the commission of the crime. (See *People* v. *Hoover, supra,* 12 Cal.3d 875, 882 fn. 5.)

But *Brocklehurst* nowhere states or implies that there can be a feigned accomplice only in a crime calling for a specific intent, although it distinguished many feigned accomplice cases dealing with such crimes. *People* v. *Spaulding,* 81 Cal.App. 615 [254 P. 614], discussed in *Brocklehurst,* involved the question whether a peace officer was an accomplice in a violation of Penal Code section 288a, not as an active participant but as an aider and abettor.

We believe that the reckless or malicious possession of explosives, forbidden by the present Health and Safety Code section 12352, is a general intent crime, and that cases holding that a witness was a feigned accomplice in a violation of a like and antecedent statute are contrary to Mahone's contention. (See *People* v. *Fitzgerald,* 14 Cal.App.2d 180 [58 P.2d 718] (overruled on other grounds in *People* v. *Weiss,* 50 Cal.2d 535, 566 [327 P.2d 527]); *People* v. *Buyle,* 20 Cal.App.2d 650 [68 P.2d 268].)

■ The definition of accomplice includes, without being limited to, anyone who aids or abets the commission of a crime. One may aid or abet the commission of a crime whether it calls for a general or a specific intent. In any crime in which there may be an accomplice because of aiding or abetting, there may also be a feigned accomplice.

*People* v. *Hoover, supra,* 12 Cal.3d 875, involving a general intent crime, held as a matter of law that the witness was not an accomplice. ■ Here the trial court submitted the question to the jury. Clearly there was no error.

Each of the two witnesses was a deputy sheriff working undercover. They were among a large group of people who attempted to form a screen with their bodies and uplifted arms while Mahone and some others placed ties across the railroad tracks, their intention being to prevent peace officers from successfully photographing the people placing the ties. Each of the two deputies testified he saw Mahone placing a timber on the tracks. They participated in the action of

partially screening the persons placing ties on the tracks from the eye of the camera by placing themselves where they could, and did, observe, so as to be able to testify that Mahone and other persons engaged in the obstruction. The conduct of the witnesses was not inconsistent with their having been feigned accomplices. Neither was an accomplice as a matter of law.

■ Since the testimony of Marmack and Kett did not require corroboration under Penal Code section 1111, the evidence that Mahone did place an obstacle on the tracks was ample. In addition, there was corroboration by a photograph showing Mahone in the act of placing such an obstacle on the tracks. The picture was identified by two other witnesses who were present but not engaged in the obstruction or the attempt to screen the obstructors from the camera's eye.

### THE BOHMER APPEAL

On the afternoon of May 11, 1972, there were demonstrations involving a crowd variously estimated at 300 to 2,000 persons at Horton Plaza and later near the City Administration Building in downtown San Diego. Various speakers took part. During the first demonstration, Bohmer, with the aid of a bullhorn, announced a "beach party" which would take place at the end of 15th Street in Del Mar at 5 p.m. on May 12, 1972. He also informed the group that one of the purposes of the party was possibly to blockade a train which might be carrying war supplies. Other persons also announced the Del Mar demonstration. At someone's request, Bohmer also made the same announcement at the City Administration Building, and did so while referring to a piece of paper given him by the man who had requested he make the announcement.

The San Diego County Sheriff's Department assigned several undercover agents to the gathering anticipated at Del Mar on May 12, 1972. Those included James Marmack, Charles Kett, Eugene Cunningham and Lazaro Lupian, the latter fitted with a body transmitter. An observation post, which offered a good view of the intersection of 15th Street and the Coast Highway, was established in the second floor of a building under construction some 150 yards from the railroad tracks. Equipment was set up to monitor and record the transmissions from Lupian's on-body transmitter. Still photographs were also taken from that location.

On May 12, 1972, between 4:15 and 5:15 p.m., people began gathering near the Santa Fe railroad tracks and depot in the vicinity of 15th Street and Coast Highway (Boulevard). Lupian arrived there at approximately 4:30 p.m. He was monitored continually from that time until 7 p.m.

Bohmer arrived at about 5:15 p.m. Prior to his arrival, a small group gathered near a pile of ties and discussed their course of action. A man, identified as Fred, an assistant instructor at [UCSD]" stated it "would be easier . . . if they moved away from the ties because it would be less obvious to the police what was really going to take place." A man from UCSD who looked like Benjamin Franklin told an undercover officer "they were going to stop a freight train carrying military equipment."

A little while after Bohmer's arrival he and a group of persons gathered on a vacant lot near the tracks. Bohmer suggested the group move since there were too many police and cameras there. Bohmer and the group then moved to another part of the lot and conducted a meeting which lasted about 45 minutes.

After the opening of the meeting, Bohmer assumed the chairmanship of the meeting.

Thereafter various persons at the meeting discussed means of stopping the train, whose arrival was expected. One suggestion was that people stand and sit on the tracks. That was opposed because it would attract the police, who would disperse the people on the tracks. It was supported by a speaker because it would not cause derailing of the train, which the speaker suggested was a capital offense. To that Bohmer said, "[W]e all understand it's not a capital offense. Yet, we all understand it is an offense—to derail a train."

There was then discussion as to escape routes, and the length of time required for escape should the train be stopped by only the physical presence of people on the tracks. Bohmer then stated: "Okay, maybe we should stop right there. Now, okay. If the train is going to be stopped by people, it's going to have to be going very slowly. In fact, I think that what to think about is how that train, you know—will be going slowly. Okay. Now, I don't want to talk about that any more. . . . . . . . . . . . . . Secondly, I think that there should be escape routes ready, so in case that the police do come, people can leave very easily. I'm not prepared to say they will come and so on, but not very quickly. Because if they do come, those escape routes should be open so people can leave very easily, and I

think we can certainly go down to the beach or down to the houses in that area. It's a good way we can go."

Another suggestion was that automobiles be driven onto the tracks at the grade crossing and stalled there.

A third suggestion was that some people move wood onto the tracks to form a barricade, while other people formed a screen for them; after the barricade had been formed, people could sit down behind it; although the police would probably come and declare an illegal assembly and the people would have to leave, the train would have to stop because of the barricade.

A suggestion was made that they vote on that. Bohmer said, "Who's in favor of that idea?" After several persons said "aye," and one said, "Let's go do it," Bohmer said, "Well, that seems to be the consensus. Let's go. Okay. Stay off the tracks —." Someone then said, "Hey, people, be sure and form a screen, you know—around where . . . . . . . . ." There was a remark, "Well, let's go down and tell everybody else about it."

Those proceedings were recorded through the transmitter carried by Lupian, who was in the crowd and identified the voice of Bohmer. The recording was imperfect in some respects, but Bohmer's counsel stipulated all the remarks attributed to Bohmer had been made by him.

Officer Lupian estimated that group numbered about 100 people by the time it broke up. The crowd continued to grow during that time and eventually some 350 to 500 people were present in the immediate vicinity.

Those who had been present during the discussions then moved down toward the railway tracks, Bohmer going in a somewhat northerly direction toward a pile of railroad ties. He took a position on the tracks and, with an electronically amplified megaphone, started off by calling people who were still on the bank and above the tracks onto the tracks. At that time people came down to the tracks and Bohmer waited some time for them to place themselves. He directed them to sit down and to straighten out on the tracks.

He then stated that the police were at the far north end of their location, down the street to the north, and that in the event they should

come in and everyone should have to run, they would have to run to the south. He added they were going to stop the train; they were not going to let it pass.

Someone approached Bohmer at that time and said something to him. Bohmer then got back on the loudspeaker and stated that the police were also at the south end of the area and that in the event the police should come in they would wait as long as they could before they ran, but that they would have to fend for themselves; they would just have to find an avenue of escape on their own. He reiterated the fact that the train was going to be coming, but they were not going to move.

He next advised the group that there would be a delay in the arrival of the train coming from the south, but that they were going to stay on the tracks anyway and block the passage of the train.

Bohmer continued talking about blocking the train and several times called people down to the tracks, making sure everybody was on the tracks.

A few minutes later the signal by the tracks changed from red to green, and someone mentioned this indicated a train would be coming.

Mahone and other persons then got off the tracks, went to a pile of wooden railroad ties, and began piling ties on the tracks. Liquid was then poured onto the ties and they burst into flames when someone tossed a lighted match on them. A sheriff's helicopter immediately moved in above the group and declared the assembly illegal and unlawful, and most of the people dispersed.

■ Bohmer was not one of those who engaged physically in placing obstructions on the railroad tracks. Although he had been at the general location of that activity earlier, he had left the scene just before the work of obstruction began. His guilt, if any, could only have resulted from incitement or abetting of the placing of the obstructions based upon his antecedent speech and conduct.

Hence arises his claim that his conviction violates his First Amendment rights of speech and assembly. In *Brandenburg* v. *Ohio,* 395 U.S. 444, 447 [23 L.Ed.2d 430, 433-434, 89 S.Ct. 1827, 1829], it was held that the mere advocacy of violence or a law violation, as a means, may not be proscribed "except where such advocacy is directed to inciting or

producing imminent lawless action and is likely to incite or produce such action." It is contended that Bohmer's criminal liability is based on his verbal conduct and thus falls within, and must be measured against, the test set out in *Brandenburg*.

Accepting that theory, the trial court instructed the jury in part as follows: "Advocating a violation of law does not constitute encouraging or instigating unless it is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."[1]

In any event Bohmer's speech, under the circumstances in which his oral declarations were made, was reasonably calculated to incite or produce imminent lawless action, and was not protected by the First Amendment. (*Brandenburg* v. *Ohio, supra,* 395 U.S. 444, 447 [23 L.Ed.2d 430, 433-434, 89 S.Ct. 1827, 1829].)[2]

The *Brandenburg* opinion, at page 448 [23 L.Ed.2d at page 434, 89 S.Ct. at page 1830], citing *Noto* v. *United States,* 367 U.S. 290, 297-298 [6 L.Ed.2d 836, 841-842, 81 S.Ct. 1517], made the following statement: " '[T]he mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action.' "

However, in a concurring opinion in *Brandenburg,* Mr. Justice Douglas would have narrowed the range within which the rights of communication might be proscribed, saying, at pages 456-457 [23 L.Ed.2d at page 439, 89 S.Ct. at page 1834]:

"The line between what is permissible and not subject to control and

---

[1] We doubt that the "imminent lawless action" test of *Brandenburg* is required in determining the guilt of one who advises the commission of a specific overt physical act which is by definition a crime. Such aiding and abetting is sometimes separated by a substantial distance in time from the actual substantive crime.

[2] In *United States* v. *Dellinger,* 472 F.2d 340, 348, Davis and five others were charged with making certain speeches for the purposes of inciting, organizing, promoting and encouraging a riot, and with conspiracy to do the same. They were acquitted of the conspiracy charge, and found guilty of the substantive crime. The judgments were reversed because of certain errors, but the Court of Appeals held the evidence sufficient to support the conviction of Davis. The court stated, at page 396: "Surging up the unoccupied hill and climbing the statue did not amount to a riot, and Davis' first direction, to take the hill, could not have been an incitement to riot. His direction to keep the hill, however, reasonably implied physical resistance to the police. We conclude it qualified as an overt act of incitement to riot, even though the violence perpetrated by the crowd did not turn out to be serious."

what may be made impermissible and subject to regulation is the line between ideas and overt acts.

"The example usually given by those who would punish speech is the case of one who falsely shouts fire in a crowded theatre.

"This is, however, a classic case where speech is brigaded with action. See *Speiser* v. *Randall,* 357 U.S. 513, 536-537 [2 L.Ed.2d 1460, 1478-1480, 78 S.Ct. 1332, 1346] (Douglas, J., concurring.) They are indeed inseparable and a prosecution can be launched for the overt acts actually caused."

*Brandenburg* did not deal with a conviction for a crime involving a physical, nonverbal act, but with the constitutionality of a statute proscribing the *advocacy* of violent action as a means of obtaining certain desired ends.

There is an obvious distinction between a statute such as that under scrutiny in *Brandenburg,* or Penal code section 11401, subdivisions 1, 2, 3 and 4, that makes criminal the speaking, writing, printing, publishing, editing, issuing or displaying of spoken or written communications advocating or teaching unlawful methods of effecting political change, and a statute that proscribes the doing, for whatever purpose, of unlawful acts defined in terms that do not include verbal or other means of communication.

Verbal incitement to such acts is rarely defended on the ground of First Amendment protection. (See *People* v. *Lee Yick,* 189 Cal. 599 [209 P. 538].)[3] Even when the proscribed act is not done, the verbal inducement to do it has often been punished as an attempt, or made separately punishable, as in the cases of the offer or solicitation of a bribe.

The man who advocates death for all rapists may do so. However, when he stands before a crowd that holds a like view and also holds a confessed rapist prisoner and he shouts, "Let's lynch him," he will not be shielded by the First Amendment if the prisoner is then and there lynched.

---

[3]In *People* v. *Lee Yick,* 189 Cal. 599, 601 [209 P. 538], the defendant "gave orders in the Chinese language to the then present members of his tong, the Suey On tong, to get their guns and kill any members of the Bing Kong tong that they could find."

The speech there goes further beyond the boundary of First Amendment protection than the cry of "fire" in the crowded theater.

The action to which Bohmer incited was not as extreme as that in the suppositious case, but the incitement was as real.

Its intention was not dissipated, and the relation of the acts of obstruction to the incitement was not broken by the fact Bohmer did not physically assist in the placement of the obstruction. The criminal complicity of the man who lights the fuse does not disappear because he is at a distance when the bomb explodes.

Penal Code section 31 in relevant part provides: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed."

It is not necessary that one be physically present when a crime is committed to abet or encourage its commission. (*People* v. *Zelver,* 135 Cal.App.2d 226, 230-231 [287 P.2d 183]; *People* v. *Eddy,* 123 Cal.App.2d 826 [268 P.2d 47]; *People* v. *Beltran,* 94 Cal.App.2d 197 [210 P.2d 238]; *People* v. *Lee Yick, supra,* 189 Cal. 599; and see footnote 8 to *People* v. *Durham,* 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198].)

We have discussed with regard to the codefendant Mahone the intent required for a violation of Penal Code section 587, subdivision 2. There was no error in the court's refusal to give the instruction known as CALJIC No. 3.31.

It was necessary to present substantial evidence that Bohmer shared the criminal intent of those who, by physical acts placed obstacles on the railroad tracks. (*People* v. *Durham, supra,* 70 Cal.2d 171.) There is abundant and substantial evidence that Bohmer shared that intent, and by his speech intended to and did encourage the placing of such obstacles by those who did place them.

Bohmer made statements at the tracks with the aid of an electronically amplified megaphone, to the effect that "we are going to stop the train, we are not going to let it pass." Those were the verbal instigations which, in the light of all that had occurred up to that point, support his

conviction under Penal Code section 587, using an aiding and abetting theory (Pen. Code, § 31). The other statements attributed to Bohmer were admissible to show the background leading up to the placing of the obstructions on the tracks.

Applying the theory and standards upon which the case was tried, we find, after an independent review of all the evidence, that Bohmer's statements, taken as a whole, did not come within the protection of the First Amendment. (*Hess* v. *Indiana,* 414 U.S. 105 [38 L.Ed.2d 303, 94 S.Ct. 326].)

The first count of the indictment by which Bohmer was charged alleged: "On or about May 12, 1972, PETER BOEHMER, PETER MAHONE, SCOTT GOODRICH, GERALD LOPEZ, WILLIAM HAIBER, DAVID KATZENTSTEIN, EDWARD VAN VALKENBURGH, and TOM KOZDEN did wilfully, unlawfully and maliciously place obstructions on the rails and tracks of the Atchison, Topeka and Santa Fe Railroad Company and did aid, promote, encourage and instigate each other in the commission of said act, in violation of Penal Code section 587 subd. 2."

Bohmer contends that under those allegations he could not be found guilty of abetting or advising or encouraging or instigating the commission of the crime by anyone other than a named defendant; that Mahone was the only other defendant convicted of a violation of Penal Code section 587, subdivision 2, and there is no substantial evidence that defendant advised or encouraged Mahone, since Mahone was not identified as being among those present when defendant was acting as chairman. However, Mahone was among those addressed by Bohmer after the latter had moved down to the tracks. Despite defense counsel's statement in oral argument, several witnesses testified Mahone was on the tracks when Bohmer was saying through the bullhorn that they were going to stop the train.

Under Penal Code section 971, one who advises and encourages the commission of a crime may be charged as a principal. (*People* v. *Nolan,* 144 Cal. 75, 79 [77 P. 774].)

The words "and did aid, promote, encourage and instigate each other in the commission of said act" in the indictment are surplusage. (*People* v. *Desmond,* 24 Cal.App. 408, 410-411 [141 P. 632].)

In California: "[T]he distinction existing at common law between

principals of the first and second degree is abolished; and the distinction between them and accessories *before* the fact is also abolished, so far as such distinction is capable of abolition. Persons standing by and aiding, abetting, or assisting, and persons not present who have advised and encouraged the perpetration of the crime, are designated as accessories, 'and shall be deemed and considered,' says the statute, 'as principals, and punished accordingly.' As principals, they may be indicted and tried together, or separately, and either may be convicted or acquitted without reference to the previous conviction or acquittal of the other." (*People* v. *Bearss,* 10 Cal. 68, 69.)

The rule in the federal court system is different, so that federal cases on the subject cited by Bohmer are not decisive.

Bohmer argues as though he had been tried and convicted of the crime of conspiracy. That is not so. However, to the extent the evidence shows a conspiracy to stop a train by placing obstructions on the tracks, the following is apposite:

"[T]he defendants were not charged with the crime of conspiracy; they were charged with murder. Durham was found guilty of that charged crime as a principal. . . .

"It is true that in presenting its case the prosecution had recourse to the principles of conspiracy. However, this thesis, far from seeking to establish a basis of criminal liability separate and apart from that of aiding and abetting, was pursued for the purpose of demonstrating Durham's intimate involvement in the continuing criminal enterprise which culminated in the shooting of Officer Du Puis." (*People* v. *Durham,* 70 Cal.2d 171, 180 [74 Cal.Rptr. 262, 449 P.2d 198].)

█ Bohmer finds fault with language used by the court in an instruction to the jury that one who advises and instigates the commission of a crime is responsible for the reasonably foreseeable consequences of the act that he advised and instigated.

"[R]easonably foreseeable acts committed in furtherance of the common illegal objective" was said by the court to be the rule in defining the liability of a coconspirator in *United States* v. *Manning* (9th Cir. 1974) 509 F.2d 1230, 1233.

The court in *People* v. *Durham, supra,* 70 Cal.2d 171, 181, quoted with approval the following language from *People* v. *Villa,* 156 Cal.App.2d 128, 133-134 [318 P.2d 828]: " 'To be an abettor the accused must have *instigated or advised* the commission of the crime *or been present for the purpose of assisting in its commission.* He must share the criminal intent with which the crime was committed. . . . ¶ *One may aid or abet in the commission of a crime without having previously entered into a conspiracy to commit it.* [Citations.] *Moreover, the aider and abettor in a proper case is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged. Whether the act committed was the natural and probable consequence of the act encouraged and the extent of defendant's knowledge are questions of fact for the jury.* [Citations.]' "

Whether the act committed was the ordinary and probable effect of the common design, or whether it was a fresh and independent product of the mind of one of the conspirators, outside of, or foreign to, the common design, is a question of fact for the jury, and if there be any evidence to support the finding of the jury on this question, its determination is conclusive. (*People* v. *Durham, supra,* 70 Cal.2d 171, 182-183.)

The addition by the trial court in the instant case of the element of reasonable foreseeability to the standard declared by *People* v. *Villa, supra,* 156 Cal.App.2d 128, is to the advantage of the defendant, if there can be said to be any distinction between a consequence that is "natural and reasonable or probable" and one that is reasonably foreseeable.

There was no prejudicial error in the instructions complained of.

■ Bohmer contends he was the victim of discriminatory prosecution. He did not make an offer of proof by substantial evidence of discrimination in fact. (See *People* v. *Gray,* 254 Cal.App.2d 256 [63 Cal.Rptr. 211].)

In the present case seven other men were charged jointly with Bohmer. The difficulty of identification of those who actually placed ties on the railroad tracks was a sufficient and reasonable explanation why some others might not have been prosecuted. As to Bohmer himself, one of the deputies who testified as to Bohmer's conduct was not at the time aware of Bohmer's name, identity or history.

Bohmer did not offer to prove that at other times or places some person or persons had intentionally placed obstacles on railroad tracks without any effort by law enforcement agencies to prosecute. The claim of discriminatory prosecution is not sustained.

Bohmer's other contentions are also unmeritorious.[4]

The orders appealed from are affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.

A petition for a rehearing was denied March 18, 1975, and appellants' petitions for a hearing by the Supreme Court were denied June 19, 1975.

---

[4]In the opinion first filed in this matter, superseded by this decision, copies of which were served on the parties, those contentions were dealt with in detail.