[Crim. No. 33379. Second Dist., Div. Five. Aug. 10, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
MARGARET TANNER, Defendant and Appellant.

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, Mary Ellen Baldridge and Donald L. A. Kerson, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KAUS, P. J.**—A jury found defendant guilty of four counts of first degree murder (Pen. Code, § 189) and one count of arson (Pen. Code, § 447a). She was sentenced to state prison for life terms on the murder counts and the middle term of four years on the arson count. Service of the latter term was stayed pursuant to Penal Code section 654 and defendant received credit for 355 days of the time already served. This appeal is from the judgment of conviction.

### FACTS

The evidence against defendant consisted chiefly of the opinions of an arson expert and her own statements made to the authorities shortly after a fire at her residence at 810 El Redondo, early in the morning of August 3, 1977. The fire resulted in the deaths of four people: three children—Bobby Potter, Judy Potter and Melinda O'Brien—and one adult, Robert Potter.

John Spiller, an arson expert from the Los Angeles Sheriff's Department, examined the scene of the fire at about 8:10 a.m. on August 3. The

upstairs of the house, where the victims had been discovered, was substantially damaged and there was also some fire damage to a downstairs closet. Spiller determined that the fire had three "points of origin"—the head of the bed in the front upstairs bedroom and two portions of the downstairs closet located beneath a stairwell.[1]

In Spiller's opinion, all three fires had been caused "by human hands applying an open flame to available combustibles. . . ." The combustibles in the bed fire had probably been the pillows, blankets or sheets. One of the closet fires had been started in a coat which had been hanging there. The other had been set in a shoe box, a plastic purse and a pair of shoes that were on the floor. Spiller concluded that the fires could not have been accidental. He also ruled out the possibility that the fire on the bed had resulted from lighted cigarettes having been placed there. He explained the latter conclusion from the fact that when there is a smoulder fire caused by lighted cigarettes laid on a bed, the mattress springs suffer a "complete loss of tension" from the prolonged exposure to heat. There was no such loss of tension here, but "more of a surface burn that spreads. . . ." Some matches were found near the head of the bed.

The fire had spread from the front upstairs bedroom to the rear upstairs bedroom,[2] where the four decedents were found. The primary cause of the death of each was "inhalation of the products of combustion . . . [lethal gases] . . . ."

Two sheriff's deputies spoke to defendant the morning of August 3, 1977. After she was advised of and waived her constitutional rights, she related the following account of her actions on the night before and the morning of the fire: Defendant and her husband, Robert Potter, went to bed in the front bedroom at about at about 8 p.m. on August 2. At about 1:30 the following morning, defendant was unable to sleep. While her husband slept, defendant got dressed and left the house on her moped. When she discovered that the bar she intended to go to was closed, she headed for a girl friend's house, but all the lights were off. She then decided to return home.

---

[1] The fire which started in the upstairs bedroom was the one which caused the upstairs damage and resulted in the four deaths. Spiller testified on cross-examination that he could not tell when the fires in the closet had been set.

[2] The door to the rear bedroom was burned at the top but a portion at the bottom remained mysteriously unburned. Spiller, who had never seen a similar pattern in a fire before, thought that the "only cause" would be that a blanket or other material had been placed at the bottom of the door.

At some point defendant's moped stopped running and would not start. She called her husband to pick her up and he arrived at about 4 a.m. He was angry and the two argued all the way home. When they got there, defendant began to gather up a pillow and blankets to sleep outside. Mr. Potter told her that she did not have to do that since he was leaving.

Defendant took 750 milligrams of a sleeping pill called Placidyl. She was extremely depressed and decided to commit suicide by setting herself on fire. She lay down on the bed and placed three lighted cigarettes beside her. The next thing she knew the drapes behind her were in flames.

She then noticed that the smoke was getting heavy and was coming from the children's room. Fearing for their safety, she ran downstairs and got a pan of water. As she attempted to douse the fire in the children's room, she ran into somebody whom she could not identify. She then ran outside into the back yard.

She was aware that there were children sleeping in the house when she had started the fire, but had "forgotten all about them."

Defendant was interviewed on the following day by John Spiller, the arson expert. After again waiving her constitutional rights, she told Spiller approximately the same story she had told the sheriff's deputies. Spiller was skeptical that the fire could have been started by cigarettes and told her so. Defendant stated that she could have started the fire with a cigarette lighter. When asked where her husband was when she set the fire on the bed, defendant said that she did not "believe" that he was in bed with her but that he could have been. As to the fires in the closet, she said that she may have set them but did not remember.

The defense was diminished capacity. Witnesses who had seen defendant both before and after the fire described her as "stoned" and "lethargic." A friend who had been with defendant and her husband the day before the fire saw her take four Placidyls and described her as "high."

Testifying in her own defense, defendant stated that she began taking pills at about noon on August 2. Between that time and 4 a.m. the next day she took ten Placidyls and three Eskatrols, a mood elevator. She felt "high." Although she was unable to remember many of the events of

August 2 and 3, her testimony was similar to the statements she had given earlier. She continued to claim that she had started the fire on the bed with lighted cigarettes. She did not think that the resulting fire would leave the room.

Defendant's personal physician testified that on August 1 he had prescribed Placidyl and Eskatrol for her. He opined that if someone took 10 Placidyls and a few Eskatrols over a 10- to 12-hour period, they would be "confused."

## ISSUES

Defendant contends that the evidence was insufficient to support her conviction of arson and that there were various instructional errors. She also claims that she is entitled to 118 days of "good time/work time" credit.

## DISCUSSION

### 1. Sufficiency of Evidence of Arson.

Initially, defendant argues that the evidence of arson was insufficient because it did not show that she "maliciously" set fire to the residence as is apparently required by a literal reading of Penal Code section 448a.[3] ■ It has consistently been held, however, that, "When related to the crime of arson, the word 'malice' denotes nothing more than a deliberate and intentional firing of a building . . . as contrasted with an accidental or unintentional ignition thereof; in short, a fire of incendiary origin." (*People v. Andrews* (1965) 234 Cal.App.2d 69, 75 [44 Cal.Rptr. 94]; see also *People v. Nance* (1972) 25 Cal.App.3d 925, 930 [102 Cal.Rptr. 266]; *People v. Williams* (1971) 19 Cal.App.3d 339, 345 [96 Cal.Rptr. 848]; *People v. Bowman* (1966) 240 Cal.App.2d 358, 387 [49 Cal.Rptr. 772].)

Defendant points to two cases—*People v. McCree* (1954) 128 Cal.App.2d 196, 202 [275 P.2d 95] and *People v. George* (1941) 42 Cal.App.2d 568, 571 [109 P.2d 404]—which she claims stand for the proposition that the word "maliciously" as used in the arson statute means more than merely "intentionally." However, the discussion in *McCree,* to which defendant alludes, is no more than a lengthy dictum. (*People v. McCree, supra,* 128 Cal.App.2d at p. 203.) Moreover, that

---

[3]The relevant portion of the statute reads: "Any person who willfully and maliciously sets fire to . . . any . . . building . . . shall . . . be sentenced to the state prison. . . ."

dictum has been explicitly rejected by one court (*People* v. *Bohmer* (1975) 46 Cal.App.3d 185, 191 [120 Cal.Rptr. 136]) and has been thoroughly repudiated—at least by implication—by the authorities cited in the preceding paragraph.

Defendant's reliance on *People* v. *George, supra,* is also unpersuasive. The sole question in that case was the constitutionality of the arson statute as applied to one who burns his own unoccupied dwelling. *George* is inapposite to the present case, in which the dwelling was occupied, deaths resulted, and felony-murder charges were predicated on the arson. ■ ". . . [I]n felony murder based on arson the jury need find only that the defendant intended to set the fire." (*People* v. *Nichols* (1970) 3 Cal.3d 150, 165 [89 Cal.Rptr. 721, 474 P.2d 673].)

■ Next, defendant urges that there was no evidence demonstrating that she intended to burn the house rather than just the bed. It was shown that the fire on the bed was started by deliberate application of an open flame to the bed clothes, an act from which it could be inferred that the bed was intended to be used as a torch to set the building on fire. In addition, however, there was the evidence of the closet fires.[4] These separate and distinct fires support the inference that defendant's plans were more grandiose than mere self-immolation and that the ignition of the residence was not accidental. (See 1 Witkin, Cal. Crimes (1963 ed.) § 466, pp. 427-428.)

## 2. Instruction That No Intent Needed to Commit Arson.

■ In view of the foregoing discussion, it is clear that the trial court erred when it delivered to the jury, on its own motion, the following instruction: "In the crime charged in Count 5 of the information, arson, the doing of the act is punishable as a crime. The intent with which the act is committed is immaterial to guilt."[5] The effect of the instruction was to remove from the jury the question of the existence of a critical element of the offense of arson—the general intent to set fire to the building.

[4]Although the arson expert testified that he could not tell the age of the closet fires, defendant admitted that she could have started them, although she did not remember having done so. There was no evidence that the fires in the closet had been set at any time other than contemporaneously with the upstairs fire.

[5]The instruction is CALJIC No. 3.33. The "Use Note" for that instruction indicates that it is applicable only to offenses which "do not involve general criminal intent . . . such as public welfare and strict liability offenses." The record contains no clue to the inspiration for the *sua sponte* delivery of the instruction here.

Nevertheless, we have concluded that the error was not prejudicial. We reach that result by virtue of the fact that from the other instructions given and the four first degree murder verdicts rendered, it is clear that the jury must have determined that defendant intended to set fire to the residence. (See *People v. Sedeno* (1974) 10 Cal.3d 703, 720-721 [112 Cal.Rptr. 1, 518 P.2d 913].) Our reasoning is as follows:

Although the jury was told with respect to count 5—the straight arson count—that defendant's guilt did not require a finding of any particular intent, the instructions on the four homicide counts made the degree of the homicide offenses depend entirely upon the intent with which defendant acted. The jury was told that to convict of first degree murder, it was required to find that defendant had the "specific intent" to commit arson (CALJIC No. 8.21), which was itself defined as the willful and malicious burning of a dwelling.[6] Absent a finding beyond a reasonable doubt that defendant possessed such specific intent, the jury could still convict of second degree murder but only if it found that the killings were "the direct causal result of an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with wanton disregard for human life. . . ." (CALJIC No. 8.31.) A third option was conviction of involuntary manslaughter—where the act carried a high risk of great bodily harm but, because of diminished capacity, the defendant was unaware of her legal duty not to perform the act. (CALJIC Nos. 8.11, 8.48.)

Thus in order for the jury to conclude, as it did, that defendant was guilty of first degree murder, it necessarily determined that she specifically intended to set fire to the residence. The error was therefore proved harmless by the verdict. (See *People v. Sedeno, supra,* 10 Cal.3d at pp. 720-721.)

Nevertheless, defendant insists that the instructions were confusing because they in effect charged the jury with the task of determining whether she specifically intended to commit an offense which itself requires no intent. However, since the erroneous instruction was, by its terms, applicable only to count 5, there is no reason to believe that it infected the resolution of the homicide counts. Moreover, there is nothing unusual about requiring a finding of a greater intent to convict of felony first degree murder than is needed to convict of the underlying felony. Indeed, that is the whole point of the holding in *People v. Sears* (1965) 62

---

[6]There were no instructions on deliberate, premeditated first degree murder.

Cal.2d 737, 745 [44 Cal.Rptr. 330, 401 P.2d 938])—that a conviction of felony first degree murder must be predicated upon proof that the defendant specifically intended to commit the underlying felony, even if the felony itself is only a general intent crime. If a properly instructed jury can render a valid felony first degree murder verdict under *Sears*—and we have no reason to believe that it cannot—then there is no reason to suspect that this jury, which was correctly instructed on felony first degree murder, did not properly consider the question of intent in rendering its verdict.

### 3. *Other Claimed Instructional Errors.*

Defendant raises a number of other contentions which attack the sufficiency of the instructions. ■ First she claims that the trial court was required, on its own motion, to deliver CALJIC No. 4.45, which states: "When a person commits an act or makes an omission through misfortune or by accident under circumstances that show no evil purpose, intention or culpable negligence, he does not thereby commit a crime." (See Pen. Code, § 26, subd. Six.)

". . . [T]he duty to give instructions, *sua sponte,* on particular defenses and their relevance to the charged offense arises only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*People v. Sedeno, supra,* 10 Cal.3d at p. 716.) There was no evidence here that the burning of the bed, and the consequent burning of the house, was the result of accident or misfortune: at a minimum, there was negligence. The sole defense was, of course, diminished capacity. Under these circumstances, the *sua sponte* delivery of CALJIC No. 4.45 would have been inappropriate.

■ Defendant next claims that the court erred in delivering CALJIC No. 2.70, which defines admissions and confessions.[7] She argues that since she did not admit to intending to burn the building, her statements could not be construed as confessions to either arson or first degree murder. By implying that the statements could be construed to be confessions, she argues, "[t]he . . . instruction carried with it the suggestion that her admission to setting fire to the bed was in itself sufficient grounds for convicting her of arson of the house."

---

[7]CALJIC No. 2.70 then read: "A statement made by a defendant other than at this trial may be either an admission or a confession. [¶] An admission is a statement by a defendant, which by itself is not sufficient to warrant an inference of guilt, but which

What this argument overlooks is that even though defendant did not admit that she intended to set fire to the residence, the statements could be interpreted as confessions to second degree murder or involuntary manslaughter, both of which were also offenses for which she was "on trial." The classification of the statements as admissions or confessions thus depended upon which of the other facts the jury believed. It was therefore proper to leave that process of classification to the jury.

■ Defendant also contends that the court erred in delivering CALJIC No. 4.21, which informs the jury that it "should consider" defendant's state of intoxication in determining the question of specific intent. She argues that the proper rule is that the jury *must* take such evidence into consideration, citing *People* v. *Stevenson* (1978) 79 Cal.App.3d 976, 987 [145 Cal.Rptr. 301].

However, unlike the situation in *Stevenson* where only CALJIC No. 4.21 was given, the trial court in the instant case also delivered CALJIC No. 3.35, which instructs the jury that it "must take all the evidence into consideration" in determining whether defendant was capable of forming a specific intent. In addition, although CALJIC No. 4.21 does use the word "should" in its second paragraph, the final sentence reads: "*If from all the evidence* you have a reasonable doubt whether defendant was capable of forming such specific intent, you must give the defendant the benefit of that doubt and find that he did not have such specific intent." (Italics added.) In this language, and in prescriptive wording of CALJIC No. 3.35, it was made clear to the jury that the word "should" was being used in its directory sense—as Webster explains, "to express duty, obligation, necessity. . . ." (Webster's New Internat. Dict. (3d ed. 1966) p. 2104.)

■ Finally, defendant urges that CALJIC No. 3.35 was misleading because it addressed the issue of diminished capacity in terms of an "abnormal mental or physical condition" and "[t]he jury had no way of knowing that voluntary intoxication was to be considered" such a condition. However, the jury was told that they were to "consider his [*sic*]

tends to prove guilt when considered with the rest of the evidence. [¶] A confession is a statement by a defendant which discloses his intentional participation in the criminal act for which he is on trial and which discloses his guilt of that crime. [¶] You are the exclusive judges as to whether an admission or a confession was made by the defendant and if the statement is true in whole or in part. If you should find that such statement is entirely untrue, you must reject it. If you find it is true in part, you may consider that part which you find to be true. [¶] Evidence of an oral admission or an oral confession of the defendant ought to be viewed with caution."

state of intoxication in determining if defendant had [the requisite] specific intent." (CALJIC No. 4.21.) In the light of the latter instruction and all of the evidence, it must have been clear that "normality" was to be equated with sobriety.

### 4. Good Time/Work Time Credit.

■ Defendant's final contention is that she is entitled to an additional 118 days of credit for good behavior during her presentence custody. The authority for granting such good behavior credits rests with the Department of Corrections. (Pen. Code, § 2931.) Before judicial relief can be obtained, defendant must show that she has exhausted her administrative remedies. (*In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) For obvious reasons, she cannot make such a showing on this appeal from this judgment.

Affirmed.

Ashby, J., and Hastings, J., concurred.

On September 11, 1979, the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied October 4, 1979.