[Crim. No. 18975. Second Dist., Div. Four. Nov. 19, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
CAROL ANNE GAVIN, Defendant and Appellant.

**COUNSEL**

Roger S. Hanson for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Alan V. Hager, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**FILES, P. J.**—Defendant was tried by a jury upon two charges: count I, possession of amphetamine tablets in violation of Health and Safety Code section 11910; and count II, possession of lysergic acid dimethyltryptamine (LSD), also a violation of section 11910. Both offenses allegedly occurred on or about October 25, 1969. The jury found her guilty of count I and not guilty of count II. The court suspended proceedings and placed defendant upon probation. She is here appealing from that judgment. The notice of appeal also refers to the order denying her motion to suppress evidence. That order is not separately appealable but is reviewed upon the appeal from the judgment. (Pen. Code, § 1538.5, subd. (m).)

We have concluded that the evidence was legally obtained, but that the court's instructions misled the jury to defendant's prejudice, and for that reason the judgment must be reversed. The two issues will be discussed separately.

### The Admissibility of the Evidence

█ In this truth-is-stranger-than-fiction drama the evidence received on the motion[1] to suppress evidence is for the most part uncontradicted. In

---

[1]There was no formal motion to suppress. The proceeding began with the court's announcement, "This is a motion pursuant to Section 1538.5 of the Penal Code." Evidence was then introduced, after which counsel made their arguments, and the court announced it "denies the motion to suppress the evidence heretofore seized."

Counsel for defendant never specifically told the court what evidence he objected to until, in argument at the close of the hearing, he contended that "the narcotics

reviewing its sufficiency we must view it in the light most favorable to the ruling of the trial court, which had the duty of passing upon the credibility of the witnesses and drawing reasonable inferences from the testimony. (*People* v. *Baker* (1968) 267 Cal.App.2d 916, 920 [73 Cal.Rptr. 455].)

Mrs. Kemp, who had never had any connection with any law enforcement agency, was a neighbor of defendant, Mrs. Gavin. Mrs. Kemp knew Mrs. Gavin had lived in the neighborhood about six months, and knew the Gavin children. On the evening of October 24, 1969, Mrs. Kemp was visiting the home of her landlord, Mr. Taylor, which was in front of the Gavin home. At 11:30 p.m. she saw Mrs. Gavin leave her house. At 11:45 p.m. Mrs. Kemp telephoned the Gavin home, talked with the 5-year-old daughter and "made arrangements to purchase some narcotics." Mrs. Kemp then walked to the front door of the Gavin home where she met the Gavin boy, aged 8, and the little girl. Mrs. Kemp then had a conversation with the boy which she related as follows: "I told him I had $5 and to give me $5 worth. He said, 'What do you want?' And I told him, I says, 'Anything that you have.' He said, 'Well, I have got them here, the reds, the whites. I have got some.' And I said, 'Give me all you have.' "

Mrs. Kemp paid the boy $5 and took her purchase back to the Taylor residence, where she telephoned the East Los Angeles sheriff's station. A few minutes later uniformed Deputy Sheriffs Harper and Warford, who had been on patrol in the area, arrived. She told them what she had done and showed them 7 orange-colored tablets and 10 double-scored white tablets. The latter appeared to the officers to be benzedrine, a form of amphetamine, possession of which is a felony under Health and Safety Code section 11910.[2]

Shortly after that Mrs. Kemp, on her own initiative or at the suggestion of the officer (each gives the other credit for the decision), telephoned the Gavin home to arrange another purchase. This time the boy answered. Mrs. Kemp told him she needed some more pills immediately. The boy said, " 'I have still got a lot left, but lady, you didn't give me enough money the first time. My mama is going to kill me.' " He then told her to come right on back. Mrs. Kemp then told Officer Warford the boy was going to have some pills for her.

---

that were seized the second time" and "the statements" should be suppressed. Inasmuch as we have concluded that none of the evidence should have been suppressed, no harm was done. In another context, failure of counsel to make a motion identifying the evidence to be suppressed could raise serious doubts in the appellate court as to just what items of evidence the trial court ruled upon.

[2]At the trial it was established that the orange tablets contained LSD and the white tablets were an amphetamine.

Accompanied by the officers, Mrs. Kemp went to the Gavin front door. The officers stood at the side as she knocked. The solid door opened inward, disclosing the Gavin boy standing behind a screen door which opened outward. In the boy's hand was a plastic bag. An adult male, who was also inside, walked rapidly towards another room. Deputy Warford testified: "I could see a portion of a white double-scored tablet wrapped in foil inside the bag. Since it was pressed against the tablet, the bag was making it clearly visible." This tablet appeared to the officer to be benzedrine.

At this point Mrs. Kemp stepped away. Deputy Warford opened the screen door and took the plastic bag from the boy's hand. Subsequent investigation of the contents established that it contained 15 benzedrine tablets.

After seizing the bag the officers went inside the house to see who was there. No one was found except the two children and a 21-year-old male named Loera, whom the officers handcuffed. Deputy Harper remained in the house while Deputy Warford went outside. At approximately 1:40 a.m. defendant arrived. Deputy Warford met her in the driveway and told her about the drug transactions. He then advised her she had a right to remain silent, a right to an attorney before she talked, a right to a free attorney if she could not afford one, and that anything she said could be used against her in court. She said that she understood, and "that she wanted to get to the bottom of this."

Defendant then entered the house, with Deputy Warford right behind her. She greeted her son in the living room and then took him to a bedroom. Deputy Warford followed to the doorway of the bedroom in order to maintain visual contact with defendant. While standing there he heard defendant say to the boy, " 'How did that lady know that we had the stuff?' " and " 'Why did you take that stuff from our hiding place?' "

Deputy Warford testified he believed that night that defendant had committed a felony, but he did not arrest her. The kitchen and living room of the house were searched, but nothing was found.

Defendant makes no argument here against the admissibility of the benzedrine and LSD acquired by Mrs. Kemp on her first visit.

■ The seizure of the plastic bag by Deputy Warford from the hands of the Gavin boy was justified by information received from Mrs. Kemp, confirmed by the officer's own observation of the white double-scored tablet showing through the plastic.[3] The officer had reasonable cause to believe the

---

[3]Although the officer's testimony is not free from ambiguity it reasonably supports the inference that the foil wrapping did not cover the face of the tablet, so that the officer could observe its whiteness, its scoring and size. He recognized this as the familiar appearance of a benzedrine tablet. This transparent bag is thus distinguish-

child was commiting an act defined as a felony. He was thus entitled to take the minor into his temporary custody (Welf. & Inst. Code, § 625) and to seize the bag for the dual purpose of capturing illegal drugs and relieving the child of further participation in a criminal enterprise. (See *Chimel* v. *California* (1969) 395 U.S. 752, 762-763 [23 L.Ed.2d 685, 693-694, 89 S.Ct. 2034]; *Harris* v. *United States* (1968) 390 U.S. 234, 236 [19 L.Ed.2d 1067, 1069, 88 S.Ct. 992].)

■ We recognize that the officer did not testify that he actually made an "arrest" of anyone that evening. It is clear that as a matter of law he had grounds to arrest defendant and Loera (the adult in the house with the children) as well as the child. All three were actually detained for a time, and all were released without being removed to the sheriff's office or to a jail. The reasons for releasing them are not material to this case, and were not explained at the trial. The fact that those persons were released afterwards does not detract from the authority of the officer to make the seizure of evidence.

It is unnecessary to discuss the legality of the search of the house since no evidence was obtained thereby.

■ The second entry by Deputy Warford, which enabled him to hear defendant's conversation with her son, was not unlawful. At the time defendant arrived the officers had reasonable cause to arrest her, either for unlawful possession of the drugs her children were selling or for contributing to their delinquency (Pen. Code, § 272). Inside the house were the Gavin children and Loera, who had been in the temporary custody of the officers since the officers' initial entry. When defendant expressed a desire to talk to her son, Deputy Warford escorted her in. His entry at that point was an essential part of the temporary detention of the persons whom the officers reasonably believed had committed a felony. While inside, Deputy Warford saw to it that defendant did not get out of his sight, a reasonable precaution, and so was able to hear her conversation. The intrusion was thus justified. (See *Curry* v. *Superior Court* (1970) 7 Cal.App.3d 836, 849 [86 Cal.Rptr. 844].) Under the circumstances, particularly after the warning given her outside, she could not reasonably have expected privacy. Eventually the officers did release Loera, who left the house, and after that the officers left. But this subsequent event does not affect the legality of the entry.

---

able from the footlocker involved in *People* v. *McGrew* (1969) 1 Cal.3d 404 [82 Cal.Rptr. 473, 462 P.2d 1] and the opaque paper bag in *People* v. *Marshall* (1968) 69 Cal.2d 51 [69 Cal.Rptr. 585, 442 P.2d 665].

■ The officer's act of opening the screen door and reaching in to seize the plastic bag was not a violation of Penal Code section 844. That section provides: "To make an arrest . . . a peace officer, may break open the door . . . of the house . . . after having demanded admittance and explained the purpose for which admittance is desired."

The purpose of the section is stated in *Duke* v. *Superior Court* (1969) 1 Cal.3d 314, 321 [82 Cal.Rptr. 348, 461 P.2d 628], thus: "The purposes and policies underlying section 844 are fourfold: (1) the protection of the privacy of the individual in his home [citations]; (2) the protection of innocent persons who may also be present on the premises where an arrest is made [citation]; (3) the prevention of situations which are conducive to violent confrontations between the occupant and individuals who enter his home without proper notice [citations]; and (4) the protection of police who might be injured by a startled and fearful householder."

In the case at bench none of these purposes and policies would have been advanced by any announcement Deputy Warford might have made. The privacy of the occupant had been broken by his own act of opening the solid door. Deputy Warford was in a uniform which identified him. If the Gavin boy understood anything about what he was doing, he understood what the officer was there for. Deputy Warford's act of opening the screen door and seizing the bag without additional formality or delay was the procedure least likely to cause violence or injury. Under the circumstances the officer's conduct was not improper. (See *People* v. *Superior Court* (1971) 17 Cal.App.3d 195, 202 [94 Cal.Rptr. 643]; *People* v. *Leighter* (1971) 15 Cal.App.3d 389, 395 [93 Cal.Rptr. 136]; *People* v. *Peterson* (1970) 9 Cal.App.3d 627, 632 [88 Cal.Rptr. 597]; *People* v. *Boone* (1969) 2 Cal.App.3d 66 [82 Cal.Rptr. 398].)

■ Following the seizure of the bag in the doorway it was necessary to go farther. When the boy first opened the front door Deputy Warford saw an adult male move quickly towards another room. The officers were entitled to arrest him as a probable principal in the boy's activities, and they could reasonably believe that the adult was trying to escape or destroy evidence. The circumstances justified an immediate entry to apprehend the adult. (*People* v. *Carrillo* (1966) 64 Cal.2d 387, 391 [50 Cal.Rptr. 185, 412 P.2d 377].)

*Jury Instruction*

At the trial defendant testified on her own behalf. She told how on September 27, 1969, she had learned that a man named Bryan, with whom

she was then sharing her house, was in the business of selling drugs. Bryan had taken her son to a public park, and had placed his bags of drugs in the boy's pockets for safekeeping until delivery was made to the buyers. When she learned this, defendant asked Bryan to move out, but he refused. Bryan then showed her the several places where his drugs were hidden in the house. At her first opportunity defendant gathered up all the drugs she could find—seconal ("reds"), benzedrine and marijuana—and placed the lot in a bag and buried it in the backyard. There was no LSD among these drugs. Then she telephoned the sheriff's office, told a narcotics officer what she had done, and said, "Somebody who would give dope to kids shouldn't be allowed to be out on the street" and she "wanted something to be done." The officer asked if she would be willing to testify in court. She said, " 'Forget it, because he will kill me.' "

Bryan was absent from September 27 until October 2, 1969. Upon his return, according to defendant's testimony, Bryan asked her what had happened to his drugs and she showed him. He then dug up the bag and brought it into the house. That evening a deputy sheriff came to the house, arrested Bryan and seized the bag of drugs. Defendant denied that she was aware of any drugs in her house between that time and the late evening of October 24.

There was also in the trial record the testimony of defendant's son to the effect that Loera, the man who was in the house on the evening of October 24, was the one who had told him where to find the LSD and benzedrine tablets and had instructed him to make the sale to Mrs. Kemp.

Among other instructions given to the jury at the request of the People was a standard instruction (now published as CALJIC (3d ed.) No. 4.71) reading as follows: "When, as in this case, it is alleged that the crime charged was committed 'on or about' a certain date, if the jury finds that the crime was commited it is not necessary that the proof show that it was committed on that precise date; it is sufficient if the proof shows that the crime was committed on or about that date."

The jury went out at 9:12 a.m. Before noon the jury returned with four requests. Two had to do with identifying which drugs were involved in each of the two counts. Another was "Please read instructions dealing with the time element involved when referring to 'on or about.' " The fourth request was "Read that portion of testimony related to what the defendant buried. What kind of drugs. Was LSD in the bag?"

After lunch the jury was brought into the courtroom.

After answering the first two inquiries the court reread the instruction

quoted above. A juror then asked, "Your Honor, the question is what do we mean by, 'about,' in length of time? Days, or minutes?"

The court then conferred with counsel at the bench. In the course of the discussion counsel for defendant said: "Well, obviously, we are concerned with the night in question, but, yet, they apparently are struggling with the fact with some three weeks or a month before that that she admitted from the stand she buried some pills in the back yard. Now, your instructions are going to allow them to go back and encompass that particular act, and if so, I would object to allowing that to go back some 30 days before the day in question, to when she explained—"

After further colloquy the court read to the jury the definition of "on or about" from Black's Law Dictionary as follows: " 'On or about; a phrase used in reciting the date of an occurrence or conveyance, or the location of it; to escape the necessity of being bound by the statement of an exact date or place; approximately; about; without substantial variance from; near.' "

Then the court said: "May the court state that the jury has asked a question in the abstract, and consequently the court must answer it in the abstract."

There was further discussion at the bench, during which the judge stated he had gone over the testimony with the reporter and ascertained that the items which were buried on September 27 included "whites" but not LSD. The record then shows this:

"MR. HANSON [defendant's attorney]: I want the district attorney to go on record and tell me—

Are you prosecuting her and urging the conviction of her based on the events of the 27th day of September, 1969? I want an answer of that on the record.

"MR. TRAUGER [deputy district attorney]: Well, goody for you.

"THE COURT: I doubt that the deputy district attorney has to answer that question, because he is prosecuting on the basis of the Complaint which states that the offense occurred on or about the 25th day of October, 1969."

Later this exchange appears:

"MR. HANSON: If they want to know what was buried—if they want to compare what was buried to what was found on the 25th of October, then, I would say it might be surprising. We might have her acquitted on one count and convicted on another.

"THE COURT: The thought occurred to me, but that is their problem not ours."

After that the court read to the jury the testimony concerning the September 27 burial of the bag containing "whites," "reds" and marijuana, but no LSD. The jurors resumed deliberations at 2:50 p.m., and at 4:30 p.m. returned a verdict of guilty of possession of amphetamine and not guilty of possession of LSD.

■ The court's failure to clear up the jury's confusion regarding the September 27 "possession" was fundamentally unfair to the defendant. It is understandable that no one anticipated the problem until the jury came in with its requests for more information. When this occurred, defendant's attorney pointed out what the difficulty was. Apparently some juror or jurors were not convinced that defendant was responsible for the drugs found in her house on the night of October 24-25, but were willing to find her guilty of possessing amphetamines on September 27. The judge's comments reflect his recognition of that situation, and his belief that he was powerless to relieve it. The abstract definitions of "on or about" which the court read to the jury did not enlighten them at all on this matter. The simple and proper solution would have been for the court to tell the jury directly that the People's evidence had been offered to prove that defendant unlawfully possessed drugs on October 24 and 25, 1969; and defendant was not charged with possession on any other date.

The judgment cannot be upheld merely because defendant's attorney failed to indicate specifically the kind of instruction which was required. The "on or about" instruction given by the court at the request of the People was, in the context of this case, confusing.[4] The jury itself called attention to the ambiguity, and defense counsel specifically pointed out the defect and its possible consequences. It was then the duty of the court to correct its mistake.

Our conclusion here is supported by a line of authority stemming from *People* v. *Castro* (1901) 133 Cal. 11 [65 P. 13] and *People* v. *Williams* (1901) 133 Cal. 165 [65 P. 323]. In *Castro* the charge was one count of rape. The prosecutrix testified to four separate acts. In affirming an order granting defendant a new trial, the Supreme Court said (at p. 13): "The information only charged one act, and upon that allegation the case must stand or fall. Possibly, any one of the acts sworn to by the prosecutrix

---

[4]In CALJIC (3d ed. 1970) page 130, following the text of instruction 4.71 which is identical with the one here referred to, this comment appears: "This instruction would also be improper if the evidence establishes two or more similar offenses upon either of which the jury might convict under a given count."

could have been selected by the state as the act charged in the pleading, but the entire four acts could not be so selected. The state, at the commencement of the trial, should have been required to select the particular act upon which it relied to make good the allegation of the information. This was not done; and even conceding that the failure to make such election at that time did not constitute error because of the want of demand upon the part of the defendant to make the election, still, when the case went to the jury, the court, in some form, should have directed their minds to the particular act of intercourse which it was incumbent upon the state to establish by the evidence, before a verdict of guilty could be returned against the defendant."

The *Williams* case also involved a single charge of rape, but the prosecutrix testified to many. The jurors were instructed that if they found defendant had committed the offense at any time within three years before the indictment, they must find him guilty. In reversing, the Supreme Court said (at p. 168): "Each of these acts was a separate offense, and the defendant could be tried for either, and separately for each of them. The jury were not even told that they must all agree that some specifically described act had been performed. A verdict of guilty could have been rendered under such an instruction, although no two jurors were convinced beyond a reasonable doubt, or at all, of the truth of the charge, as to any one of these separate offenses."

The principle delineated in those cases has been followed in *People* v. *Ruiz* (1920) 48 Cal.App. 693 [192 P. 327]; *People* v. *Elgar* (1918) 36 Cal.App. 114 [171 P. 697]; *People* v. *Hatch* (1910) 13 Cal.App. 521, 534 [109 P. 1097]; *People* v. *McMillan* (1941) 45 Cal.App.2d Supp. 821, 830 [114 P.2d 440].

In the case at bench the problem was not one of election, because the People's evidence precisely established the time of the alleged offenses within two hours, at the end of one calendar day and the beginning of another. The evidence suggesting a distinct offense arose in the testimony of the defendant which was intended as exculpatory but which, after cross-examination, would have supported a finding of a felony distinct from those charged. The manner in which the problem arose in this case is different from that in the cited cases, but the prejudice is no less here where the jury indicated it was willing to consider convicting the defendant for the uncharged offense.

The decision in *People* v. *Wrigley* (1968) 69 Cal.2d 149, 155 [70 Cal. Rptr. 116, 443 P.2d 580], deals with a related, but different, problem, and cannot be read as casting any doubt upon the *Castro-Williams* line of cases. In *Wrigley,* the charge was one count of lewd acts upon the body

of an 11-year-old girl "during the month of June 1965." The testimony of the victim showed lewd touchings on two occasions, but she was vague about calendar dates. Defendant denied having done anything of the kind, and attempted to prove an alibi. His contention on appeal was stated in the opinion of the Supreme Court at page 155: "Defendant contends that it was error for the court not to have limited the time which the jury could have found the offense to have occurred to the period which the prosecution selected as the time of the commission thereof, namely May or June of 1965."

The court held that where prosecution evidence did not point to a particular day or hour, to the exclusion of any other time, it was proper to tell the jury it might find the defendant guilty if it found he had committed the offense "at any time within the time covered by the evidence." The giving of the "on or about" instruction in that case was approved. The problem there considered was that the uncertainty of the prosecutrix as to calendar dates handicapped defendant in the presentation of an alibi defense. There was no contention that defendant was in danger of being convicted of an uncharged offense, or that part of the jury might think one offense proved and part think a different offense proved. The *Castro-Williams* situation was not before the court, and those cases were not discussed.

The judgment is reversed. The attempted appeal from the order is dismissed.

Kingsley, J., and Dunn, J., concurred.