[Crim. No. 17077. First Dist., Div. Three. Mar. 23, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
WENDOL YARBER, Defendant and Appellant.

[Crim. No. 16836. First Dist., Div. Three. Mar. 23, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
BONNIE SUE YARBER, Defendant and Appellant.

**COUNSEL**

William D. Farber and Quin Denvir, State Public Defender, under appointments by the Court of Appeal, Clifton R. Jeffers, Chief Assistant State Public Defender, B. E. Bergesen III and Gary D. Sowards, Deputy State Public Defenders, for Defendants and Appellants.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler and Robert H. Philibosian, Chief Assistant Attorneys General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg and John H. Sugiyama, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

FEINBERG, J.—Appellant Wendol Yarber was found guilty by jury of 18 counts of oral copulation with a minor (Pen. Code, § 288a), all but 2 of which were with minors under the age of 14 and more than 10 years younger than he (Pen. Code, § 288a, subd. (c)), and 2 counts of contributing to the delinquency of a minor. His wife, appellant Bonnie Sue Yarber, was convicted at the same trial of one count of Penal Code section 288a, subdivision (c).

Criminal proceedings were adjourned, and mentally disordered sex offender proceedings were instituted against both appellants. Ultimately Bonnie was sentenced to prison. On April 28, 1977, the court found that appellant Wendol was a mentally disordered sex offender and committed him to a state hospital. Both defendants appeal.

The testimony of five girls in their early teenage years showed that they had been present on several occasions during the early summer of 1976 in the apartment of the appellants, where they (or some of them) were allowed to view films on sexual themes, to observe sex acts between appellants, and to engage in oral copulation with appellant Wendol. Appellants did not testify, but appellant Bonnie's sister, an alleged victim, was called by the prosecution and denied that the sex acts had taken place. The testimony was uncontradicted that no coercion had been applied to the girls, and, in fact, they solicited each other to perform the sex acts. There was evidence that on occasion they screened the films for themselves, and three of the girls made home movies of each other orally copulating Wendol. Two of the girls once accompanied Wendol to an adult book store where one overheard him inquire with regard to developing the movie films. None of the films or other corroborating physical evidence was introduced.

The crucial events so far as Bonnie is concerned took place between June 12 and June 17. Wendol was charged with engaging in oral copulation with one or more of the girls on June 12, 14, 15 and 17. Bonnie was charged with offenses on June 15 and 17. No proof was presented at trial concerning illegal acts on the 15th, and the charges relating to that date were "dismissed" by the court, leaving Bonnie charged only with what occurred on the 17th. One of the girls, Mary S., testified that she orally copulated Wendol on June 12 at the request of Renee M., another girl. She testified that she repeated the act on June 14 at Bonnie's request.

On June 17, Bonnie orally copulated Wendol,[1] in which act she was followed by Renee and Mary, according to Mary. On this occasion Bonnie did not ask Mary to engage in the act,[2] and Mary, when asked at trial why she did so, said "I don't know."

Wendol was found guilty of having committed the offense with Mary on June 14 and 17, among other dates, and Bonnie with having aided and abetted him on the 17th.

A. *Appellants' contentions as to Mary S.'s testimony about Wendol's statement.*

Both appellants complain of the admission of certain testimony of Mary S.

Mary S. testified that she went with Wendol to an adult book store where he "wanted to know if that man could get some films developed for him . . . the ones that were made at his apartment." The district attorney offered the testimony on the issue of "intent," and an objection on the ground of "hearsay" was sustained. Eventually, the testimony was allowed in evidence not on the question of intent but "as an admission" by Wendol and for the "sole purpose" of showing that films were made involving the participants in the alleged acts. In his argument, the district attorney referred to this testimony and said that it proved intent on the part of both appellants. Bonnie's attorney objected that the testimony was not admitted as to his client. The court noted the objection and directed the district attorney to proceed with his argument.

---

[1] The evidence on this point was substantial but, highly conflicting. Mary herself expressed doubt about it on cross-examination, and the testimony of her sister Sandy and of Renee M. was inconsistent with it. The gist of Renee M.'s testimony was that Bonnie was uninvolved in the goings-on between Wendol and the girls and indifferent to them.

[2] The district attorney asserted that Bonnie asked Mary to orally copulate Wendol on the 17th, and his theory, articulated in closing argument, was that Bonnie was guilty of aiding and abetting Wendol to engage in oral intercourse with Mary on June 17 by asking her to do so—e.g., "the 17th of June is the date she is charged with these activities . . . . [I]t was the next day [i.e., after June 16] Bonnie was there and Wendol was there; Mary was there, and at that time, oral copulation occurred between Bonnie and Wendol, between Mary and Wendol, between Renee and Wendol. And that time was one of the times that Bonnie asked for them to participate in this and they did, that's why she's charged as an aider and abettor."

The Attorney General expressly concedes on appeal that the evidence showed Bonnie's having asked Mary to perform the act on the 14th and not on the 17th.

The consequences of this misrepresentation on the part of the district attorney, and the failure of Bonnie's trial counsel to object or even to respond to it, do not have to be determined, given our view of the sufficiency of the evidence and instructions.

On appeal, it is contended on Bonnie's behalf that this inaction of the court had the effect of admitting the testimony against her and deprived her of her right to cross-examine Mary in connection with the testimony.

Mary's testimony as to Wendol's statement was hearsay. Because the statement was a statement of a party, it was an exception to the hearsay rule and admissible against Wendol. (Evid. Code, § 1220.) It is immaterial whether or not the statement was, strictly speaking, an "admission." The testimony was not admissible against Bonnie. (Cf., Evid. Code, § 1223.) If it had implicated her, she would have been able to complain that her right to confront and cross-examine Wendol was denied. (*Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]; *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].)

The statement had no tendency to prove "intent." There was not even an issue of intent in the case, the evidence being such that "the acts, if committed, indisputably show an evil intent." (*People v. Kelley* (1967) 66 Cal.2d 232, 243 [57 Cal.Rptr. 363, 424 P.2d 947].)

For these reasons, the district attorney should not have been allowed to argue that the testimony proved Bonnie's intent. But for precisely the same reasons, her contention that she was denied an opportunity to cross-examine Mary and was harmed by the evidence is without force.

The testimony did not add anything substantial to Mary's other testimony as to the making of the films and Bonnie's burning them. To the extent that it proved that the films were made, it proved nothing as to whether Wendol engaged in oral copulation with Mary on June 17 or whether Bonnie aided and abetted him. Her contradictory testimony placed the making of the films both before and after June 17, but, whenever they were made, she did not indicate that Bonnie played a part in making them.

It is contended on Wendol's behalf that this testimony varied from the district attorney's offer of proof and did *not* identify the films sought to be developed with the films made of and by the girls. It could not be contended that the testimony was irrelevant, simply that it had limited probative value. But, by the same token, it had a negligible prejudicial effect. Thus there was no reason to exclude it.

The more serious contention in this regard is that the judge, in admonishing the jury that the evidence was being received for a limited

purpose, *did* identify the films sought to be developed as films made of and by the girls. He said: "[The answers] are being received by the Court solely for the purpose of showing that there were films made at the apartment involving at least this witness and perhaps other witnesses who will testify or persons who are alleged to have been involved in the acts that are set forth in the information."

No objection was made to this statement, nor was any clarifying admonition sought at trial.

The judge did not say that the testimony *showed* that films were made at the apartment, only that it was admitted for *the purpose of showing* that fact. At the conclusion of the case, the judge instructed the jury that he had "not intended . . . to intimate or suggest what you should find to be the facts . . . ."

Again, the testimony of Mary stood or fell according to whether the jury believed or disbelieved her allegations that she had orally copulated Wendol on a number of occasions and did not depend for support on her further allegation that he spoke of a photographic record of such acts.

B.  ▉  *Appellant Wendol Yarber asserts prosecutorial misconduct as impairing the presumption of innocence.*

During his opening statement, the district attorney, referring to Bonnie's sister, said "the sixth witness, the evidence will show, we've been unable to subpoena but that we fully expect her to testify, in that she has been subpoenaed by the defense." Wendol's and Bonnie's trial attorneys objected and moved for a mistrial, and Wendol (but not Bonnie) now seeks reversal on the ground that the district attorney's statement implied that the defendants had a burden of producing evidence to disprove the charges.

It appears from the record that such an implication was not intended by the district attorney. That the defense *had* to call a witness is a secondary inference to be drawn from the remark; the primary inference is that they *would* do so. Certainly, it is no secret to jurors that defendants *do* call witnesses.

Although he might have been more specific, the judge promptly told the jurors to disregard the remark. As it turned out, Bonnie's sister was called as a witness on behalf of the prosecution. The judge fully and

properly instructed the jury as to the presumption of innocence and burden of proof and the right of the defendant to rest on the state of the evidence.

C. *Appellant Wendol Yarber's assertion of error arising out of the trial court's failure to ascertain whether appellant should be treated as a mentally disordered sex offender at a facility other than a state hospital.*

Upon adjourning criminal proceedings and instituting mentally disordered sex offender proceedings as to Wendol, the trial judge appointed psychiatrists and ordered them to report as to whether Wendol "would benefit from care and treatment in a state hospital." His attorney requested that advice also be sought as to whether he would be amenable to treatment in a facility other than a state hospital. The judge expressed the view that the issue for the psychiatrists was whether the offender were "treatable," not where he should be treated.

On the basis of the doctor's reports and the probation report, the court found that Wendol was a mentally disordered sex offender and that "he could benefit by treatment in a state hospital . . . ," and committed him to the Department of Mental Health for placement in Atascadero State Hospital pursuant to Welfare and Institutions Code section 6316.[3]

1. *The court-appointed experts made no recommendation as to whether defendant could be treated in some mental health facility other than a state hospital.*

The statute providing for the appointment of psychologists or psychiatrists in a mentally disordered sex offender proceeding, section 6307, says that they shall "make a personal examination of the alleged mentally disordered sex offender, directed toward ascertaining whether the person is a mentally disordered sex offender." Section 6308, relating to the report and testimony of the psychologists or psychiatrists, provides that the report shall contain "his opinion as to whether or not the person would benefit by care and treatment in a state hospital." It would therefore seem that there is no requirement that the court direct the experts to concern themselves with amenability to treatment other than in a state hospital.

---

[3]Hereafter, all statutory references adverted to in this portion of the opinion are to sections of the Welfare and Institutions Code.

Section 6316, on the other hand, specifies what disposition may be made of the offender "[i]f, after examination and hearing, the court finds that the person is a mentally disordered sex offender and that the person could benefit by treatment in a state hospital, or other mental health facility . . . ." The examination and hearing in question are those referred to in sections 6309-6315, at which the psychologists or psychiatrists appointed by the court, other experts produced by the parties, and other witnesses having knowledge of the mental condition of the offender, may testify. Clearly, the judge must base his findings as to whether the offender could or could not benefit by treatment in a mental health facility other than a state hospital on the testimony of such witnesses. It would seem preferable that the doctors or psychologists address themselves to that issue in their reports, especially in contemplation of the fact that the hearing may be conducted in their absence and on the basis of their reports, a procedure authorized by section 6308. Not to solicit the advice of the experts as to whether an offender is amenable to treatment in a facility other than a state hospital in a sense predisposes in favor of a finding that, if he is amenable at all, it is only to treatment in a state hospital. The 1975 and 1976 amendments to section 6316, providing for commitment to facilities other than state hospitals, may be taken as some evidence of the intent of the Legislature that full consideration should be given to such an alternative.

Although the better practice may be for the court to direct the appointed experts to state an opinion as to whether an offender could benefit from treatment in a facility other than a state hospital, it does not necessarily follow that the offender has a procedural right that the court do so. The offender does have other means to the same end. He can informally seek the opinion of the court-appointed psychologists or psychiatrists on this question. He can call them as witnesses at the hearing. (§ 6309.) He can call other experts. (§ 6311.) Here, the appellant did not attempt to take advantage of any of these ways of showing that he was amenable to alternative treatment.

Moreover, as we shall discuss below, section 6316, in our view, mandated that before the court could issue a commitment order, it had to refer the defendant to the county mental health director or his designee for evaluation and for a recommendation whether the defendant should be committed to a state hospital or to *another* mental health facility.

2. **(2)** *Failure to order an evaluation by the county mental health director.*

Before being committed to Atascadero, Wendol was not evaluated by the county mental health director. It is contended on appeal that his commitment was therefore void.

The first paragraph of Welfare and Institutions Code section 6316 provides: "If, after examination and hearing, the court finds that the person is a mentally disordered sex offender and that the person could benefit by treatment in a state hospital, or other mental health facility the court in its discretion has the alternative to return the person to the criminal court for further disposition, or may make an order committing the person to the department for placement in a state hospital, or may commit the person to the county mental health director for placement in an appropriate public or private mental health facility, approved by such director, and a copy of such commitment shall be personally served upon said person within five days after the making of such order. * * * The court shall transmit a copy of its order to the county mental health director or his designee. Prior to making such order, the court shall order the county mental health director or his designee to evaluate the defendant and to submit to the court within 15 judicial days of such order his written recommendation as to whether the defendant should be committed to a state hospital or to another mental health facility. No person shall be admitted to a state hospital or other facility or accepted for outpatient treatment under this section without having been evaluated by the county mental health director or his or her designee."[4]

Prior to 1975, section 6316 provided that a commitment of a mentally disordered sex offender could only be to a state hospital. Further, the section made no provision for a reference to the county mental health director. In 1975, operative January 1976, the section was amended to provide an alternative place of commitment, i.e., a commitment to "the county mental health director for placement in an appropriate public or private mental health facility." (Stats. 1975, ch. 1274, § 9.) At the same time, the section was amended to add the following sentences: "The court shall transmit a copy of its order to the county mental health director or his designee. Prior to making such order, the court *shall* order the county mental health director or his designee to evaluate the defendant and to

---

[4] The asterisks indicate a provision deleted by the 1977 amendments, i.e., after Wendol was committed, which has no relevance to this appeal; at the same time, the underscored section was added.

submit to the court within 15 judicial days of such order his written recommendation as to whether the defendant should be committed to a state hospital or to another mental health facility." (Italics added.) (*Ibid.*)

The respondent contends that the amendment contemplated a reference to the county mental health director only if the court was thinking in terms of a commitment to other than a state hospital. We disagree. In our view, the Legislature intended that *before* a court decided to commit a defendant to a mental health facility, it would have the recommendation of the county mental health director as to whether the commitment should be to a state hospital or to some other mental health facility.[5] It would seem absurd to say, in effect, that the court should make up its mind as to what facility the defendant should be committed *before* it receives information from the county mental health director as to what facility may be appropriate. Our view is buttressed by the fact, as we have noted above, that the recommendations of the court-appointed experts, under section 6308, are limited to an expression of an opinion as to whether the defendant, assuming he is a mentally disordered sex offender, would benefit by care and treatment *in a state hospital.* Thus, at that point, there is no information or recommendation that might enlighten the court as to the availability of *other* mental health facilities in which the defendant could benefit by care and treatment and thus assist the court in determining where to commit the defendant.

Numerous cases hold that procedural errors or omissions in mentally disordered sex offender commitment proceedings render the commitment void. (*People* v. *Succop* (1967) 67 Cal.2d 785, 789 [63 Cal.Rptr. 569, 433 P.2d 473]; *In re Acosta* (1971) 21 Cal.App.3d 51, 54 [98 Cal.Rptr. 208]; *In re Baker* (1970) 5 Cal.App.3d 55, 57 [84 Cal.Rptr. 814]; *People* v. *Harvath* (1969) 1 Cal.App.3d 521, 525-526 [82 Cal.Rptr. 48]; *People* v. *Hunter* (1969) 270 Cal.App.2d 683, 685 [76 Cal.Rptr. 101]; *People* v. *McDonald* (1968) 257 Cal.App.2d 846, 849-850 [65 Cal.Rptr. 530].)

Respondent argues that "appellant has a limited equitable basis for claiming error," because he submitted the question of his mentally disordered sex offender status on the reports and failed to request an evaluation by the county mental health director. However, even if he had had a full hearing, an evaluation by the county director would not have been a part of it, and, absent a showing that he knew his right to an

---

[5]The Legislature made explicit in 1977 that which we hold was implicit in the 1975 amendment. (See fn. 4, *ante.*)

evaluation, he cannot be deemed to have waived it. (*People* v. *Hunter, supra,* at p. 685.)

The failure to order an evaluation by the county mental health director was prejudicial, i.e., the result of such an evaluation might well have been a recommendation for treatment other than in a state hospital. Wendol had no known prior record except "spending two weeks in jail in Arkansas when he was 15 years of age as a result of a family argument" and "one overnight in an Oklahoma jail for being drunk." Prior to his arrest for this offense, he had worked for the same employer for three years as a machine operator. He and Bonnie had children, now 10 and 7, and there is nothing in the record to indicate that he molested them. He had sought psychotherapy on his own initiative. His condition was evaluated at various mental hospitals as "a mixture of the features of schizophrenia and depression."

Though the error was prejudicial, the march of events may have made the matter largely moot. Almost two years have elapsed since the date of commitment. For all that we know, defendant may no longer be at the state facility. He may have been transferred to a local facility (see §§ 6325, 6325.1, 6327) or he may not be confined to any mental health facility, state hospital or otherwise. Thus, to set aside the commitment herein may be an exercise in futility. Accordingly, we remand the case to the trial court to determine the present status of appellant. If he is still in custody as a mentally disordered sex offender, in a state hospital, then the trial court is directed to set aside its commitment. In such a case, if the trial court deems it appropriate, it can reinstitute mentally disordered sex offender proceedings *from the beginning,* in light of the lapse of time since the original psychiatric diagnosis. On the other hand, if appellant is in some mental health facility other than a state hospital, or is no longer an inpatient in any mental health facility, then it appears to us the matter has become moot.

The other points raised by appellant in connection with his commitment as a mentally disordered sex offender need not be discussed in view of the resolution made above.

D. *Appeal of Bonnie Yarber.*

We consider, in addition to the error claimed by appellant Bonnie discussed in part A above, her contention that there was evidence on the basis of which the jury might have found that Mary S. was her

accomplice, but the jury was not given the appropriate accomplice instructions. Although we reject appellant's contention, we discuss this issue preliminary to a consideration of what we do hold to be a deficiency in the jury instructions, and in order to clarify this issue should there be a retrial.

1. ▮ *Failure to give, sua sponte, instructions as to the testimony of an accomplice with respect to Mary S.*

It is contended on appellant Bonnie's behalf that, if her liability for Wendol and Mary S.'s engaging in oral copulation is premised on her "aiding and abetting" Wendol by encouraging Mary to orally copulate him, then Mary may have been an accomplice, depending on the jury determination of her capacity to commit the crime, and the court, therefore, should have, on its own motion, instructed the jury that accomplice testimony is untrustworthy (CALJIC No. 3.18) and insufficient unless corroborated (CALJIC No. 3.11).

An accomplice is defined by the Penal Code as "one who is liable to prosecution for the identical offense charged against the defendant . . . ." (Pen. Code, § 1111.)

In *People* v. *McRae* (1947) 31 Cal.2d 184 [187 P.2d 741], the defendant was charged with violating Penal Code section 288a. The evidence showed that a 15-year-old boy had submitted without resistance to the act committed on him by the defendant. The Supreme Court ruled: "Since his testimony shows that he knew the act was wrongful and that he willingly participated therein, it follows that he was an accomplice." (*Id.,* at p. 186.) When *McRae* was decided, however, section 288a forbade *any* act of oral copulation, regardless of the age of the participants. A child who engaged in such an act with an adult might therefore himself be liable. But the 1975 amendments to section 288a limited the offense to adults who engage in oral copulation with minors or to persons who compel the participation of others. As a result, Mary could not *commit* a violation of section 288a. Therefore, she was not "liable to prosecution for the identical offense charged against the defendant" (Pen. Code, § 1111) and was not an accomplice as a matter of law. Thus, neither CALJIC Nos. 3.11 nor 3.18 was appropriate.

Moreover, it is the general rule that a person for whose protection a penal statute is intended is not liable to prosecution for aiding and abetting the violation of that statute.

In *People* v. *De Paula* (1954) 43 Cal.2d 643, 647 [276 P.2d 600], the defendant was convicted of using a minor for the purpose of transporting heroin, and the court held:

"The essence of the offense is its tendency to debauch or corrupt minors. . . . In such circumstances, 'the minor is regarded as a victim and not as an accomplice whose testimony it is necessary to corroborate under the provision of section 1111 of the Penal Code.' [Citation.]

"Defendant argues that since the girl here was concerned in the commission of the crime, she was a principal under section 31 of the Penal Code so as to be liable to prosecution for the identical offense, and section 1111 of the Penal Code, requiring corroboration of the testimony of an accomplice, would therefore be applicable. But 'an accomplice must stand in the same relation to the crime as the person charged therewith and must approach it from the same direction.' [Citation.] Since the minor involved is the victim and the offense . . . is the harmful act to that victim with the resulting harm to society in general, it necessarily follows that in a prosecution under that section the minor involved cannot be held a principal in the sense of being subject to prosecution for the same identical offense, within the meaning of section 1111 of the Penal Code. [Citation.]'"

*De Paula* is followed in *People* v. *Poindexter* (1958) 51 Cal.2d 142, 149-150 [330 P.2d 763] [furnishing a narcotic (marijuana) to a minor]; *People* v. *Montalvo* (1971) 4 Cal.3d 328, 331 [93 Cal.Rptr. 581, 482 P.2d 205, 49 A.L.R.3d 518] [ditto (heroin)]; *De Paula* and *Poindexter* are followed in a number of intermediate appellate decisions, some of which are collected in *People* v. *Thomas* (1968) 267 Cal.App.2d 698, 703 [73 Cal.Rptr. 590], disapproved on other grounds in *People* v. *Mayberry* (1975) 15 Cal.3d 143, 158 [125 Cal.Rptr. 745, 542 P.2d 1337]; see *Williams* v. *Superior Court* (1973) 30 Cal.App.3d 8 [106 Cal.Rptr. 89] (a prostitute cannot be charged with conspiracy in a case in which the alleged coconspirator is her pimp or panderer).

2. *Sufficiency of the evidence and instructions as to aiding and abetting.*

According to the testimony of Mary S., Bonnie asked her if she would orally copulate Wendol on June 14. Mary said she orally copulated Wendol on June 17 but at no one's request. Wendol was convicted of violating Penal Code section 288a on June 14 and on June 17; Bonnie was convicted of aiding and abetting the offense on June 17. There was no

conflict in the evidence that Bonnie asked Mary to perform the sex act on the 14th and not on the 17th. The occurrence of these two events was clear and distinct in the mind of the witness.

Appellant urges, and respondent concedes, that, whatever the reason for the jury's having found Bonnie guilty (see fn. 2 above), she could not properly have been convicted of an offense occurring on the 17th based solely on what she did on the 14th. ■ This conclusion is based on the general principle that "Due process of law requires that an accused be advised of the charges against him in order that he may have a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial" (*In re Hess* (1955) 45 Cal.2d 171, 175 [288 P.2d 5]) and on its corollary that "where there are multiple acts placed before a jury, each being a separate chargeable offense in itself, the prosecution must elect the act on which the charge will stand," or otherwise "the jurors [might] range over the evidence at will and pick out any one of the offenses upon which to found its verdict" (*People* v. *Creighton* (1976) 57 Cal.App.3d 314, 318 [129 Cal.Rptr. 249], disapproved on other grounds in *People* v. *Thomas* (1978) 20 Cal.3d 457, 468), and there would be the danger of a defendant "being convicted of an uncharged offense, or that part of the jury might think one offense proved and part think a different offense proved." (*People* v. *Gavin* (1971) 21 Cal.App.3d 408, 420 [98 Cal.Rptr. 518]; *People* v. *Creighton, supra,* at page 320.)

For the same reasons, the parties also agree that, assuming the evidence to have been sufficient to support a conviction of Bonnie for aiding and abetting Wendol to have oral intercourse with Mary S. on June 14, but not on June 17, the jury's finding that she did so on June 17 would be a "material variance." (See generally *People* v. *LaMarr* (1942) 20 Cal.2d 705, 711 [128 P.2d 345].)

■ Therefore, we turn to the question of whether the evidence was indeed sufficient to support a conviction of the offense on June 17.

The facts of this case present the unusual situation in which the liability of an aider and abettor depends not on her aiding by encouraging the perpetrator of the crime but on her aiding the perpetrator by encouraging a third party, who could not be liable either as a perpetrator or as an aider and abettor, to engage in an act in violation of the law.

Our research has disclosed two cases which present similar situations.

In *People* v. *Rios* (1954) 127 Cal.App.2d 620 [274 P.2d 163], appellants were convicted of administering heroin to a minor. E injected heroin into R and H, and then into the minor. R and H were convicted of aiding and abetting E. The purpose of R's and H's receiving the injections was to show the minor that "the injection would be free from pain and would cause a pleasant reaction." (*Id.*, at p. 622.) The conviction was affirmed.

In *People* v. *Lewis* (1952) 113 Cal.App.2d 468 [248 P.2d 461], appellant was convicted of statutory rape. C, an 18-year-old boy, brought B, a 16-year-old girl, to L's home, where L and S showed "moving picture films depicting the sexual act and other obscenities" to B. Then S drove C and B to a "secluded spot in the country" where C and B had sexual intercourse and L took pictures. (*Id.*, at p. 469.) It was assumed, but not decided, that the act of taking pictures did not by itself prove aiding and abetting the statutory rape. It was held, however, that "[t]he jury could reasonably infer . . . that . . . [L] showed the pictures to B to encourage and induce her to engage in the forbidden act and later took the pictures in aid and furtherance of that preconceived design." (*Id.*, at p. 470.)

In the present case, the jury might have found that Bonnie orally copulated Wendol on the 17th (although, as indicated in fn. 1 above, the evidence of such fact was highly conflicting), and might have inferred that she did so in order to encourage and induce Mary to follow suit. That inference would perhaps not be the most reasonable one, given the facts that on June 12 Mary had orally copulated Wendol upon Renee M.'s or Bonnie's sister's encouragement and inducement, that on June 17 Bonnie did not offer any other encouragement or inducement, and that Mary could not say why she engaged in the act on the latter occasion. An at least equally strong inference would be that Bonnie orally copulated Wendol for her own purposes and without regard for whether Mary followed suit.

Recognizing that this case "seems to go to the limit of the law" (Williams, Criminal Law (2d ed. 1961) § 121, p. 356), we are constrained to find that the evidence met the minimal standards of sufficiency.

It will be noted, however, that both *People* v. *Rios, supra,* at page 622, and *People* v. *Lewis, supra,* at page 470, speak in terms of the "design" or

"purpose" of the defendants to induce the girls to engage in the unlawful conduct.

■ In the present case, the jury was not instructed that the aider and abettor *must have the purpose of aiding the perpetrator.* It was instructed, in accordance with CALJIC No. 3.00[6] and No. 3.01,[7] that Bonnie might be found guilty of aiding and abetting Wendol if she *knew* his purpose—i.e., regardless of *her purpose* in orally copulating him.

The general rule. is: "In order to aid and abet another to commit a crime, it is necessary that the accused in some sort associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree; the same criminal intent must exist in the minds of both. . . ." (22 C.J.S., Criminal Law, § 87, p. 255.)

A substantial body of decisional law supports the proposition that, in order to be liable as an aider and abettor, a defendant must share the criminal intent of the perpetrator. (*People* v. *Francis* (1969) 71 Cal.2d 66, 72 [75 Cal.Rptr. 199, 450 P.2d 591]; *People* v. *Durham* (1969) 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198]; *People* v. *Bohmer* (1975) 46 Cal.App.3d 185, 199 [120 Cal.Rptr. 136]; *People* v. *Doptis* (1969) 276 Cal.App.2d 738, 742 [81 Cal.Rptr. 314]; *People* v. *Butts* (1965) 236 Cal.App.2d 817, 836 [46 Cal.Rptr. 362]; *Pinell* v. *Superior Court* (1965) 232 Cal.App.2d 284, 287 [42 Cal.Rptr. 676]; *People* v. *Villa* (1957) 156 Cal.App.2d 128, 134 [318 P.2d 828] (Peters, P. J.); *People* v. *Terman* (1935) 4 Cal.App.2d 345, 347, 349 [40 P.2d 915]; *People* v. *Kerrick* (1927) 86 Cal.App. 542, 550 [261 P. 756]; see *People* v. *Hoover* (1974) 12 Cal.3d 875, 879 [117 Cal.Rptr. 672, 528 P.2d 760], and cases cited thereat for the proposition that "it had to be demonstrated that . . . [an asserted accomplice] acted with 'guilty knowledge and intent with regard to the commission of the crime' "; *People* v. *Cisneros* (1973) 34 Cal.App.3d 399,

---

[6]"CALJIC 3.00 (1976 Revision)—PRINCIPALS—DEFINED. All persons concerned in the commission of a crime who either directly and actively commit the act constituting the offense or who with knowledge of the unlawful purpose of the perpetrator of the crime aid and abet in its commission or, whether present or not, who advise and encourage its commission, are regarded by the law as principals in the crime thus committed and are equally guilty thereof. [One who aids and abets is not only guilty as a principal of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable as a principal for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged.]"

[7]"CALJIC 3.01 (1974 Revision)—AIDING AND ABETTING DEFINED. A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime."

414 [110 Cal.Rptr. 269]; *People* v. *Williams* (1968) 260 Cal.App.2d 868, 873 [67 Cal.Rptr. 442].) CALJIC Nos. 3.00 and 3.01 (3d ed. 1961) so stated the rule.

The instructions were revised in 1974 in accordance with authority that all that is required to convict a defendant of "aiding and abetting" is that he act with knowledge of the wrongful purpose of the perpetrator. (*People* v. *Terry* (1970) 2 Cal.3d 362, 401 [85 Cal.Rptr. 409, 466 P.2d 961]; *People* v. *Ott* (1978) 84 Cal.App.3d 118, 130 [148 Cal.Rptr. 479]; *People* v. *Standifer* (1974) 38 Cal.App.3d 733, 744 [113 Cal.Rptr. 653]; *People* v. *Scofield* (1971) 17 Cal.App.3d 1018, 1026 [95 Cal.Rptr. 405]; *People* v. *Belenger* (1963) 222 Cal.App.2d 159, 163 [34 Cal.Rptr. 918]; *People* v. *Ellhamer* (1962) 199 Cal.App.2d 777, 782 [18 Cal.Rptr. 905]; *People* v. *Goldstein* (1956) 146 Cal.App.2d 268, 273 [303 P.2d 892]; *People* v. *Beltran* (1949) 94 Cal.App.2d 197, 206 [209 P.2d 635]; see *People* v. *Holford* (1965) 63 Cal.2d 74, 81 [45 Cal.Rptr. 167, 403 P.2d 423].)

Between these two lines of cases lie a few decisions which suggest that *either* shared intent *or* knowledge of intent is required. *People* v. *Vasquez* (1972) 29 Cal.App.3d 81, 87 [105 Cal.Rptr. 181], says that "[he] may so aid and assist with knowledge or awareness of the wrongful purpose of the perpetrator [citations] or he may so act because he has the same evil intent as the perpetrator [citations]." *People* v. *Standifer, supra,* 38 Cal.App.3d 733, 744 [ which appears to be the main authority for the 1974 CALJIC changes], states that "the test is 'did the defendant aid and abet the perpetrator with knowledge of the perpetrator's criminal intent' " and that an instruction that " 'the proof must show not only aiding the actor but also sharing the required intent' " gave an appellant "more than he was legally entitled to," but then rules that "[t]he only intent the jury was obligated to find . . . was his *intention to knowingly* aid . . . [the perpetrator] in the commission of a felony." (Italics added.)

*People* v. *Ellhamer* (1962) 199 Cal.App.2d 777, 782 [18 Cal.Rptr. 905], attempts a synthesis of the opposing lines of cases: "[a]lthough the guilt of the aider and abettor is dependent upon the actor's crime, criminal intent of the aider and abettor is presumed from his actions with knowledge of the actor's wrongful purpose."[8] *People* v. *Ott, supra,* 84 Cal.App.3d 118,

---

[8]The "authorities" cited in *Ellhamer* in support of this proposition (Annot. (1922) 16 A.L.R. 1043, 1045-1047, and 22 C.J.S., Criminal Law, § 87, p. 259) are not the most persuasive. The American Law Reports reference is to a 1922 article which is based largely on a foursome of 19th century Alabama and Texas decisions arguably to this

130, relying on *Ellhamer,* holds that "aiding in the commission of the crime with knowledge of the wrongful purpose of the perpetrator *eo ipso* establishes the criminal intent."

That one may be an aider and abettor and not necessarily share—i.e., have the same—intent as the perpetrator (contra the rule of the line of cases ending in *Francis*), follows from the well-established principle that perpetrators and their aiders and abettors may be found guilty of different degrees of a crime. For example, a man may be guilty of murder because his actions preceding a fight show that he harbored malice aforethought but a person who came to his aid during the fight and acted upon "a sudden quarrel or heat of passion" would be guilty only of manslaughter. (*People* v. *Blackwood* (1939) 35 Cal.App.2d 728, 732-733 [96 P.2d 982].) However, it does not follow that an aider and abettor need not have *any* criminal intent.

That knowledge of the wrongful purpose of the perpetrator may be insufficient (contra the rule of the line of cases ending in *Terry*) follows from the "feigned accomplice" cases, where the non-criminal liability of such persons, who may do all the things that would otherwise constitute aiding and abetting and with knowledge of the purpose of the perpetrator, can only be based on their lack of specific intent. (See *People* v. *Brocklehurst* (1971) 14 Cal.App.3d 473, 476-478 [92 Cal.Rptr. 340], and cases cited therein.) But, again, it does not follow that there is *no* knowledge element.

An additional reason why knowledge of the purpose of the perpetrator is not, without an intent to aid him, sufficient for proof of aiding and abetting is that the alleged aider and abettor may know the purpose of the perpetrator and take an action which aids him, and yet not be guilty of aiding and abetting because of the existence of a state of mind which negates intent, such as mistake of fact or mistake of law or a belief that one's life would be endangered if one refused to aid the perpetrator (duress). Thus, in a robbery case (a specific intent crime), if A *intends to* rob a store of property which B (but not A) believes (honestly but mistakenly) is rightfully B's, and B knows A's purpose and aids him to

---

effect. The Corpus Juris Secundum reference is to a statement based on an early Arizona case that, in a specific intent crime, it is sufficient that the aider and abettor know the intent of the perpetrator.

rob the store, A would be guilty of robbery but B would not because B's mistake of law would negate an intent on his part to steal. Similarly, in a rape case (a general intent crime), if A had sexual relations with C, a female, and B aided A with knowledge of his purpose but with the good faith belief, not shared by A, that C had consented to have sexual relations with A, A would be guilty but B would not because B's mistake of fact would negate his intent. In any case in which A compelled B to aid him to commit a crime, B would not be guilty, even though he had knowledge of A's purpose, because he did not in law intend to aid A. (*People* v. *Brown* (1970) 6 Cal.App.3d 619 [86 Cal.Rptr. 149].)

Aiding a perpetrator with knowledge of his wrongful purpose does not necessarily entail an intent to aid him (contra the *Ellhamer* and *Ott* notion) because a person might know a perpetrator's purpose and commit some act which in fact aids or encourages him but which the person did not intend and reasonably did not expect to have such an effect. The picturesque facts of *Hicks* v. *United States* (1893) 150 U.S. 442 [37 L.Ed. 1137, 14 S.Ct. 144], illustrate this point. Hicks and Colvard were riding on horseback along a road when they encountered Rowe, also on horseback and armed with a Winchester rifle. Twice Rowe raised his rifle and pointed it at Colvard. Hicks took off his hat and said to Colvard "Take off your hat and die like a man," whereupon Rowe pointed his rifle a third time at Colvard, shot and killed him. The judge instructed the jury that Hicks could be found guilty if he encouraged the shooting of Colvard, and Hicks was found guilty. The Supreme Court reversed. It noted Hicks' testimony that he expected Rowe to shoot him or Colvard and that his ambiguous gesture with regard to his hat and remark concerning Colvard's may not have been meant to encourage Rowe, even though it may have had that effect, but may have been an act "of desperation, occasioned by his belief that Rowe would shoot one or both of them." (*Id.*, at p. 447 [37 L.Ed. at p. 1140].) The court held the trial judge erroneously "omitted to instruct the jury that the acts or words of encouragement and abetting must have been used by the accused with the *intention of encouraging and abetting Rowe*. So far as the instruction goes, the words may have been used for a different purpose, and yet have had the actual effect of inciting Rowe to commit the murderous act. Hicks, indeed, testified that the expressions used by him were intended to dissuade Rowe from shooting. But the jury were left to find Hicks guilty as a principal because the effect of his words may have had the result of encouraging Rowe to shoot, regardless of Hicks' intention." (Italics added.) (*Id.*, at p. 449 [37 L.Ed. at p. 1140].)

The *Ellhamer/Ott* synthesis that intent is inferred from the knowledge by the aider and abettor of the perpetrator's purpose is sound, generally, as a matter of human experience, but we cannot extrapolate therefrom, as a matter of law, that the inference *must* be drawn. Intent is what must be *proved*; from a person's action with knowledge of the purpose of the perpetrator of a crime, his intent to aid the perpetrator can be *inferred.* In the absence of evidence to the contrary, the intent may be regarded as established. But where a contrary inference is reasonable—where there is room for doubt that a person intended to aid a perpetrator—his knowledge of the perpetrator's purpose will not suffice.[9]

The jury in the present case should have been instructed that a person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator, he *intentionally* aids, promotes, encourages or instigates by act or advice the commission of such crime.[10] On the peculiar facts of this case, it is reasonably probable that the jury found Bonnie Yarber guilty[11] because they believed that her act[12] had encouraged Mary to engage in the sex act with Wendol[13] and because she

---

[9]A closer approximation to a rule which would tend to harmonize the opposing decisions would be that a person's action with knowledge of a perpetrator's purpose and *a knowledge that his action will aid the perpetrator* establishes his intent to aid the perpetrator. It is hard to conceive of a case in which a person with such knowledge would not have such intent. But a case can perhaps be given. In proposing that "foresight that an event will certainly follow as the result of one's own conduct is equivalent to intention" may be true of perpetrators but not necessarily of secondary parties, Williams, *op. cit. supra*, section 124, page 368, gives as an illustration *Beatty* v. *Gilbanks* (1882) 9 Q.B.D. 308, where *it was held that the Salvation Army was not liable for the conduct of a rival society*, even though its members knew, in holding a meeting, that they would be set upon by their opponents. Williams says: "What is needed, therefore, to deal with a situation of this type, is a general rule that a person does not become a party to another's crime merely because he foresees the crime as the consequence of his own conduct. To be implicated, he must desire in some way to promote the crime, or to assist in its promotion; he need not desire the criminal outcome, provided that he knowingly assists . . . . ¶ Foresight merely of probability does not amount to intention . . . ." (Williams, *op. cit. supra*, § 20, p. 44.)

[10]This view comports with that of the authors of the Model Penal Code: "(3) A person is an accomplice of another person in the commission of an offense if: (a) *with the purpose of promoting or facilitating the commission of the offense*, he (i) solicits such other person to commit it; or (ii) aids or agrees or attempts to aid such other person in planning or committing it; . . ." (Italics added.) (Model Pen. Code (Proposed Official Draft 1962) § 2.06, subsec. (3).)

[11]If not because of the confusion over her conduct on the 14th and the 17th—see footnote 2 above.

[12]Assuming, as we must, that she performed it—but see footnote 1 above.

[13]Even though Mary did not perceive the connection—see text accompanying footnote 2 above.

had knowledge of Wendol's purpose, without regard to whether she intended that her act would have such effect. Instructing the jury in terms which omitted the intention element was therefore prejudicial error as to appellant Bonnie Yarber.

As to appellant Wendol Yarber, the convictions are affirmed, the order of commitment as a mentally disordered sex offender is remanded for such further proceedings as are consistent with this opinion.

As to appellant Bonnie Yarber, the judgment is reversed.

White, P. J., concurred.

**SCOTT, J.**—I dissent from the reversal of the conviction of Bonnie Sue Yarber.

The lead opinion appears to hold that in the absence of evidence to the contrary, intent to aid and abet may be inferred from a person's action with knowledge of the purpose of the perpetrator of a crime. But where a contrary inference is reasonable, his knowledge of the perpetrator's purpose will not suffice and intent must be proved by other evidence.

However, the facts of this particular case indicate that a contrary inference is not reasonable and that a shared criminal intent is undisputably indicated. Pornographic movies had been shown to the minors in appellants' bedroom with both Bonnie Sue and Wendol present. There was testimony that on June 14, Bonnie Sue had asked Mary S. to orally copulate Wendol. (While Bonnie Sue cannot be convicted of the violation that occurred on June 17 based solely on what she did on June 14, her activities on June 14 are probative of her desires and intent on June 17.) Mary S. also testified that Bonnie Sue "asked me to eat her out while she gives Wendol a blow job." Such evidence indicates that Bonnie Sue wanted the children to be participants and not mere observers of her sexual activities with Wendol. The evidence indicates that Bonnie Sue knew that acts of oral copulation with the minors had taken place in her apartment previous to June 17. Nevertheless, she engaged in oral copulation with Wendol in the presence of the children, she was present at the time the charged oral copulation with the children took place, and she did nothing to prevent it. The entire behavior of Bonnie Sue and Wendol indicates that they were acting as a unit (see *People* v. *Rios* (1954)

127 Cal.App.2d 620, 622 [274 P.2d 163]) up to and including June 17, in their attempts to involve the children in their sexual activity.

Failure to instruct the jury, as suggested by the lead opinion, was not error. I would affirm the conviction.*

I concur with the affirmation of the conviction of Wendol Yarber and the remand as ordered.

A petition for a rehearing was denied April 20, 1979, Scott, J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied May 17, 1979. Richardson, J., was of the opinion that the petition should be granted in No. 16836.

---

*The aiding and abetting issue upon which the lead opinion bases its reversal was not raised by the State Public Defender in his briefs on behalf of appellant Bonnie Sue. The issue was first suggested by the court at oral argument, then briefed by the parties. Since the advent of the State Public Defender's office, it is our experience that they have left no legal stones unturned or shied away from any possible theory of error in the discharge of their obligation to defendants. The error upon which the majority has seized to reverse this conviction was not raised by the public defender simply because the error does not exist.